J-A28016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.N.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.C.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1188 EDA 2016 |

Appeal from the Order Entered March 16, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000804-2015

BEFORE:  PANELLA, SHOGAN, and PLATT*, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED DECEMBER 30, 2016**

E.C.G. ("Mother") appeals from the decree and order dated and entered on March 16, 2016, granting the petition filed by the Philadelphia County Department of Human Services ("DHS" or the "Agency"), seeking to involuntarily terminate her parental rights to her dependent, minor child, A.N.P., a daughter born in January of 2012 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and to change Child's permanency goal from reunification to adoption under the Juvenile Act, 42 Pa.C.S. § 6351.[1]  We vacate and remand.

_____

* Retired Senior Judge assigned to the Superior Court.

[1]  In its opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court stated that Child's biological father, D.D., Sr. ("Father") died in October of 2015.
*(Footnote Continued Next Page)*

The trial court set forth the factual and procedural background of this appeal in its opinion filed pursuant to Pa.R.A.P. 1925(a) on May 16, 2016, which we incorporate herein. Trial Court Opinion, 5/16/16, at 1–5. Notably, Child was born prematurely at six months gestation, and, as a result, has had numerous special needs, including a gastrointestinal ("GI") feeding tube for more than four years. *Id.* On March 20, 2013, the trial court adjudicated Child dependent and placed her in the legal and physical custody of DHS.

On November 6, 2015, DHS filed a petition for the termination of Mother's parental rights and for a change in Child's permanency goal from return to parent or guardian to adoption. On March 16, 2016, the trial court held a hearing on the termination and goal-change petitions. At the hearing, the trial court admitted the entire dependency record regarding Child as DHS Exhibit 2, and a summary of Child's medical records as DHS Exhibit 3. N.T., 3/16/16, at 7–8. DHS first presented the testimony of the Community Umbrella Agency ("CUA") caseworker, Torshia Admiral. N.T., 3/16/16, at 9. During the re-cross examination of Ms. Admiral by Mother's counsel,

*(Footnote Continued)* ────────────────────

Trial Court Opinion, 5/16/16, at 5. This date is apparently a typographical error. The trial court admitted the certificate of death for Father, which reflects that Father died in October of 2013, as DHS Exhibit 1. The trial court, nevertheless, in a decree dated and entered on March 16, 2016, also involuntarily terminated the parental rights of the unknown putative father of Child. The unknown father has not filed an appeal from the termination of his parental rights or the change of Child's permanency goal to adoption, nor is he a party to the present appeal.

Attorney John Capaldi, Mother left the courtroom, claiming she felt ill, and the trial court excused her. *Id.* at 36. Her counsel requested a five-minute recess, which the trial court denied, and the testimony concluded. *Id.* at 37. The trial court ruled that Mother had waived her right to present her own testimony by leaving the courtroom without leave of court, and it refused to allow her counsel to present her testimony on direct examination to refute the evidence against her. *Id.* at 40–42. Although Mother attempted to re-enter the courtroom, the trial court refused her reentry and rendered its decision on the petitions without hearing Mother's testimony, over the objection of Mother's counsel. *Id.* at 42–45.

In the decree and order dated and entered on March 16, 2016, the trial court granted the involuntary termination petition pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and the petition to change Child's permanency goal to adoption under 42 Pa.C.S. § 6351.

On April 15, 2016, Mother timely filed a notice of appeal and concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises three issues, as follows:

1. Whether the trial court erred in refusing [Mother] to participate in the hearing and testify and provide evidence on her own behalf when she returned to the courtroom after briefly removing herself due to physical illness and emotional upset?

2. Whether the trial court's ruling to involuntarily terminate [Mother's] parental rights to her daughter, A.N.P., was not

supported by clear and convincing evidence establishing grounds for involuntary termination?

3. Whether the trial court's decision to change A.N.P.'s permanency goal from reunification to adoption was not supported by clear and convincing evidence that such decision would best protect the child's needs and welfare?

Mother's Brief at 5.

In her first issue, Mother argues that the trial court egregiously erred and significantly abused its judicial discretion when it denied Mother an opportunity to participate, testify, and present evidence on her own behalf after Mother claimed to be ill and left the courtroom. Mother's Brief at 15. Mother recounts that the judge became angry because Mother left her courtroom without asking permission when Mother stated that she felt sick. Mother argues that the trial court, in refusing to allow her to testify or even re-enter the courtroom and be a participant in the termination proceedings, violated her constitutional guarantee to due process. Mother alleges that this violation of her constitutional due-process guarantee, which is included in the statutory scheme of the Adoption Act, particularly 23 Pa.C.S. § 2503(b)(1),[2] and the Juvenile Act, 42 Pa.C.S. §§ 6337 and 6338, was a fundamental deprivation of her right to testify on her own behalf and participate in the proceedings. Mother's Brief at 19–23. Mother states that

_____

[2] Mother's reliance on section 2503(b)(1) is misplaced, as that section provides for hearings in matters of voluntary relinquishment. Section 2513(b) of the Adoption Act relates to hearings in involuntary termination matters.

the trial court's ruling was especially egregious because, after initially excusing Mother, the trial court then extinguished Mother's parental rights to Child and changed the permanency goal for Child to adoption without hearing from Mother. Mother asserts that the trial court improperly denied her counsel's reasonable request for a brief recess in order to check on the health of his client and, in the alternative, for a continuance. Mother argues that the trial court's preclusion of her from the courtroom effectively allowed DHS to present its case unopposed, without her presence or participation, and eliminated the possibility of the court's receipt of contrary testimony and evidence by Mother that would weigh on the court's very important ruling. Mother asserts that, at no time prior in the three-year history of this case, had she ever applied for or been granted a continuance in this matter. Accordingly, Mother contends that the trial court's unreasonable conduct denied her a fair and impartial hearing.

Mother then raises her second and third issues in the alternative. In her second issue, Mother contends that the trial court's termination decree is not supported by clear and convincing, competent evidence under 23 Pa.C.S. §§ 2511(a)(1) and (8).[3] Mother's Brief at 15–16. Mother complains that the evidence DHS presented at the hearing failed to establish any parental

---

[3] By failing to present argument on subsection 2511(a)(2) and (5), Mother has waived any challenge to a termination under those subsections. Pa.R.A.P. 2119.

objective plan that Mother had substantially failed to meet or would prohibit reunification of Child with her. In her third, alternative issue, Mother argues that the record does not demonstrate the trial court gave primary consideration to the developmental, physical, and emotional needs and welfare of Child under 23 Pa.C.S. § 2511(b). *Id.* at 16. Mother alleges that DHS presented only superfluous and minimal evidence at the hearing with regard to whether the termination of her parental rights would meet the best interests and developmental, physical, and emotional needs and welfare of Child.

Initially, we will address Mother's first issue. We note, however, that all of her issues are interrelated and require our review of the entire transcript for the events that transpired at the termination and goal-change proceeding.

At the hearing, Ms. Admiral testified that Child was currently residing in a medical foster care home with the R.s, who had been certified as caregivers through Bethanna, a community program. N.T., 3/16/16, at 9. Child was doing extremely well in the R.s' home and was attending pre-school at Good Shepherd three times a week. *Id.* Previously, Child had attended Pediatria Specialty, a medical daycare facility, until the week prior to the hearing, March 10, 2016, when her GI feeding tube was removed. *Id.* At the time of the hearing, Child was receiving speech therapy, physical therapy, occupational therapy, and specialized instruction at the pre-school.

*Id.* Child's foster parents took her to therapy at St. Christopher's Hospital and to her medical appointments. *Id.* at 9–10. Child consistently attended the therapy appointments and her medical appointments. *Id.* at 10. Child's foster parents took her to her pediatrician and her gastrointestinal specialist at least three times a month. *Id.* At the time of the hearing, Child was four years old. *Id.* She was current in her medical care, and she was receiving the services required for her special needs. *Id.* Ms. Admiral last saw Child in her foster care home on the date of the hearing; she found that Child appeared to be safe and that all of her needs were being met. *Id.* at 11. Ms. Admiral testified on direct examination and cross-examination that the R.s are a pre-adoptive home for Child. *Id.*

On cross-examination by Mother's counsel, Ms. Admiral testified that, since Child's GI tube had been removed, she would not need to be seen as frequently by her physicians. N.T., 3/16/16, at 12. She also testified that Child has weekly supervised visits with Mother. *Id.*

On re-direct examination, Ms. Admiral testified that this case first came to DHS with a General Protective Services ("GPS") report made on February 18, 2013. Having been born premature at twenty-five weeks, Child was diagnosed with intestinal failure, chronic respiratory disease, and sleep apnea, and she was developmentally delayed. N.T., 3/16/16, at 12–13. At that time, Child was residing at St. Christopher's Hospital, where she remained for one year. *Id.* Child was then sent to a medical facility,

Pediatria Specialty for one year. *Id.* Child was placed with the R.s in September of 2014. *Id.*

Ms. Admiral further testified that, while Child was initially in St. Christopher's Hospital, DHS received a report that Mother was not visiting Child regularly, at times going ten days without visiting Child in the hospital. N.T., 3/16/16, at 13–14. When Mother threatened to take Child from the hospital, DHS obtained an Order of Protective Custody ("OPC"). *Id.* at 14. While Child was in the hospital with her extreme medical needs, DHS offered Mother medical training for those needs. *Id.* Mother completed only one day of the three training sessions offered. *Id.* Mother was inattentive and unfocused, instead of learning how to care for Child properly. *Id.*

When Mother did not adequately complete the training sessions, the hospital requested that DHS obtain an OPC for Child to be removed from Mother's care on an ongoing basis. N.T., 3/16/16, at 15. Ms. Admiral was assigned to this case in January of 2015. *Id.* When the case initially came to DHS, DHS established Single Case Plan ("SCP") or Family Service Plan ("FSP") objectives for Mother. *Id.* at 16. Those objectives were for Mother to attend the Clinical Evaluation Unit ("CEU") forthwith. *Id.* Mother was to complete drug treatment and mental health treatment; to attend domestic violence counseling; to be consistent with visitation; and to provide documentation for any reason she canceled visits. *Id.* Mother also had objectives with respect to medical training and attending Child's medical

appointments. *Id.* When Ms. Admiral was assigned to the case, Mother had not completed any of those objectives, nor had Mother completed them at the time of the termination/goal change hearing. *Id.* at 16-17.

Upon her assignment to the case, Ms. Admiral reviewed Mother's objectives with her regularly; they were the original objectives established for Mother. N.T., 3/16/16, at 17. Since the inception of the case, DHS consistently invited Mother to participate in SCP meetings, which were held every three months. *Id.* at 17–18. Mother participated in only one SCP meeting; that meeting was held after Ms. Admiral assumed the case and after the birth of Mother's son in August of 2015. *Id.* at 18–19.

Prior to Ms. Admiral's involvement, DHS offered Mother three supervised visits per week with Child. However, because of her inconsistencies in visitation, visits were changed to once a week beginning in November of 2014. N.T., 3/16/16, at 18–19. After Ms. Admiral assumed the case, DHS offered Mother weekly, supervised visits with Child every Friday, and Mother was aware of the visitation arrangement offered. *Id.*

Since January of 2015, Mother's visits with Child have continued to be inconsistent, with Mother often missing at least one visit a month, and sometimes two visits per month. N.T., 3/16/16, at 19. The month of August of 2015, after Mother gave birth to her son, was the only month that Mother attended every scheduled visit. *Id.* In speaking with Ms. Admiral, Mother did not inform Ms. Admiral that she was pregnant, nor was

Ms. Admiral otherwise aware of that fact until after Mother had given birth to a son. *Id.* at 19–20.

From the time Ms. Admiral acquired the case in January of 2015 until the termination petition was filed in November of 2015, Mother had attended twenty-two of the possible forty visits offered her. N.T., 3/16/16, at 20. Mother had never fully complied with the visitation arrangement since Child came into care. *Id.*

Mother was aware of Child's medical conditions for the duration of the case, and she has been aware of when and where Child's appointments occurred, because she had attended appointments at St. Christopher's Hospital. N.T., 3/16/16, at 20–21. Child attends her appointments only at St. Christopher's Hospital. *Id.* at 21. Ms. Admiral notifies Mother of upcoming appointments. *Id.* Mother has the phone number of the foster parents, and she is able to call and receive updates from them. *Id.* Mother's attendance at Child's medical appointments has remained inconsistent. *Id.* at 22. Mother attended three of eight appointments between August of 2015 and March of 2016, but she left one appointment early before Child was seen. *Id.* Prior to August of 2015, Mother did not attend Child's medical appointments, and she attended only two out of approximately twenty doctor's appointments from the period of January of 2015 to August of 2015. *Id.*

When Child was at Pediatria Specialty, Mother was offered medical training to learn how to care for Child, but she never completed that training. N.T., 3/16/16, at 23. When Child was at St. Christopher's Hospital, Mother was also offered medical training, but again she did not complete it. *Id.* Moreover, Bethanna offered Mother medical training, but she did not participate. *Id.* Mother has not completed training to care for Child's medical needs. *Id.* Mother never expressed to Ms. Admiral her desire to be trained to care for Child's medical needs. *Id.* Mother did not disclose to Ms. Admiral that she had any health complications that would have prevented her from attending visits or training. *Id.* Mother was not incarcerated while Ms. Admiral was assigned the case. *Id.* at 24. Ms. Admiral believes that, without her assistance or reminders from the foster parent, Mother would be unable to manage Child's medical appointments. *Id.*

Mother has not completed any drug and alcohol treatment. N.T., 3/16/16, at 24. Mother was participating in the Sobriety Through Outpatient ("STOP") intensive outpatient program; however, based on the information from Community Behavioral Health ("CBH"), Mother stopped attending on November 25, 2015. *Id.* at 24–25. Mother was supposed to attend three times per week, twelve sessions per month, and she was enrolled over a four-month period. *Id.* at 25. Mother attended twelve out of forty-eight sessions with STOP as of November 25, 2015. *Id.*

Ms. Admiral testified that Mother never completed a course of mental health treatment, but she was participating in treatment at John F. Kennedy Center. N.T., 3/16/16, at 26. Prior to the filing of the termination/goal change petition, Mother was not receiving any mental health services, although mental health was an objective for her from the outset of the case. *Id.* Mother never completed court-ordered services through Achieving Reunification Center ("ARC"), and she was discharged for being inactive. *Id.* Mother did not complete parenting classes. *Id.* Mother was directed to obtain employment services through ARC, but she had not been employed since Ms. Admiral assumed the case. *Id.* at 26–27. Ms. Admiral testified that Mother has not completed any of her objectives. *Id.* at 27.

Ms. Admiral opined that a permanency goal change to adoption was in Child's best interest because Child has improved greatly, developmentally and medically, as a result of the foster parents' commitment to her. N.T., 3/16/16, at 27. Child looks to the foster parents to meet her basic needs. *Id.* Ms. Admiral testified that Child's GI tube is now removed because the foster parents have been encouraging Child to eat solid food. *Id.* Ms. Admiral stated that Child is gaining weight and is doing very well. *Id.* The foster parents have taken Child to all of her appointments, and Child has not required hospitalization since being in their care. *Id.*

Ms. Admiral stated that the visits between Mother and Child are supervised and that there is good interaction between Mother and Child.

N.T., 3/16/16, at 28. Ms. Admiral gave as an example that Mother does Child's hair during the visits. *Id.* Ms. Admiral testified that Child looks at Mother the same way as she looks at Ms. Admiral, as an individual she sees regularly. Ms. Admiral opined that, to Child, there is no difference between Mother being Child's mother and Ms. Admiral being Child's case manager. *Id.*

With regard to Child's interaction with the foster parents, Ms. Admiral testified there is a bond between Child and the foster parents, based on her observation of their interaction at the foster parents' home. N.T., 3/16/16, at 29. Each time Ms. Admiral is at the home of the foster parents, Child has many toys around her, and the foster parents interact well with Child. *Id.* Child is always looking to the foster parents for hugs and kisses. *Id.* She seeks the foster parents to meet her basic needs, and they are able to do so. *Id.* Ms. Admiral has observed a positive attachment between Child and the foster parents, which indicates a fuller, more affectionate relationship and bond than Child's interaction with Mother. *Id.* Ms. Admiral testified the foster parents are ensuring that Child attends her medical appointments and therapeutic services and receives the care that she needs. *Id.* at 30. Ms. Admiral believes that Child would not suffer any adverse effects from the termination of Mother's parental rights. *Id.* at 29.

Subsequently, the Child Advocate, Attorney Fegan, conducted re-cross examination of Ms. Admiral. Ms. Admiral testified that Child is currently

undergoing physical therapy, speech therapy, and occupational therapy once per week. N.T., 3/16/16, at 30. Ms. Admiral explained that Child is functioning at the level of an eighteen-month-old child, as she has speech delays. *Id.* at 31. Ms. Admiral also testified that the R.s spend a significant amount of time on a daily basis helping Child overcome her disabilities. *Id.* at 32.

Mother's counsel then conducted re-cross examination of Ms. Admiral. During the questioning by Mother's counsel, Mr. Capaldi, the following exchange took place:

Q. As you mentioned, Ms. Admiral, you were not the original worker, correct? You came on in –

THE COURT: She already stated that four times, January, 2015.

MR. CAPALDI: January, 2015, correct.

BY MR. CAPALDI:

Q. When you came onto the case there was already a case file for this, correct?

A. Yes.

Q. And you had a chance to review all those documents and become familiar with the case, correct?

A. Yes.

Q. Okay. So you're aware that prior to being placed with the [R.s] that [Child] had experienced a burn incident in a prior foster home where she had severely burned her hand, right?

A. No, I'm not (inaudible)

Q. You're not aware of this?

[DHS Attorney] MR. WISE: Objection to relevance.

THE COURT: Yes, where's the relevance?

MR. CAPALDI: Well the relevance will be, Your Honor, my client – there's been testimony that my client, at that time of placement and thereafter was belligerent at times and things.

THE COURT: I didn't hear belligerent.

MR. CAPALDI: Well maybe that's the wrong word.

THE COURT: Let me tell you what I heard. Let me tell you what I heard.

MR. CAPALDI: Okay.

THE COURT: I heard out of 40 visits she only made 22 visits. That's what I heard. I heard that out of eight medical visits she only made two. Let's talk about that. We sent her to CEU. She was at STOP out of 48 visits she only made 12. Speak to that. Don't bring up any other investigations, allegations or what happened to this child in foster care because I'm dealing with the [R.s] who are a pre-adoptive resource.

MR. CAPALDI: Okay.

THE COURT: So this is your time to [trumpet] the wonderful things about your client because I need to make a decision and I'm not going to get into the weeds on this case. So let's go.

MR. CAPALDI: Okay.

BY MR. CAPALDI:

Q. First off, are the [R.s] -- is this a pre-adoptive home?

A. Yes, it is.

Q. Okay. All right. My client, she relies on public transportation, correct?

A. Yes.

Q. Okay. So she needs to use that to make visits, make doctor's appointments, things along those lines, correct?

A. Yes.

Q. Okay. Regarding the testimony of her visits which you said she made a little bit more than half. Did she ever, did she indicate to you at any times where she had legitimate excuses for not attending? These are the visits with the child, Your Honor, not the medical visits. The visits with the child?

A. Yes, she would contact the case aide and say that she won't, you know, be able to come.

Q. Okay. So she did follow those protocols, correct?

A. Yes.

Q. And as you mentioned, she did give birth in August of last year to another child, [A.], correct?

A. Yes.

Q. And that child is actually in the care of her and the father, who is the gentleman, the fiancé who is outside, correct?

MR. WISE: Your Honor, I'm going to object because that case was discharged. The child was discharged –

THE COURT: I don't know why we're talking about [A.]

MR. WISE: He was discharged into the care of father not mother.

THE COURT: At this point –

MR. CAPALDI: Well, Your Honor –

THE COURT: At this point, so much testimony has been damaging to your client about inconsistencies even before August. I mean, so we shouldn't start there. And if mom -- Mom –

MR. CAPALDI: Mom, mom, mom –

THE COURT: Okay. No, no –

[MOTHER]: I'm getting sick.

THE COURT: Okay, bye. Your [sic] excused. Your [sic] excused.

MR. CAPALDI: She's getting sick.

THE COURT: Whatever. You don't have a client.

MR. CAPALDI: Well, can I –

THE COURT: You have – I'm giving you seven minutes. Make your case because now she walked out. She didn't ask permission of the Court. That's disrespectful considering that this is a critical hearing. So –

MR. CAPALDI: Your Honor, can I ask for a five-minute recess to see if she –

THE COURT: No, I'm not doing a five-minute recess. We're going -- do your case. This case --

MR. CAPALDI: Well I just want to see if she was sick. If she's going to vomit or something.

THE COURT: You know what, doesn't she have her fiancé out there.[sic] He'll see to it if she's sick or not. Let's go. Let's do this case.

MR. CAPALDI: Okay, okay, okay. Very well, Your Honor.

BY MR. CAPALDI:

Q. So of some of the visits that she missed she would follow the protocol to -- correct?

THE COURT: Whatever. You don't have a client.

MR. CAPALDI: Well can I –

A. Yeah.

- 17 -

MR. WISE: Objection, asked and answered.

BY MR. CAPALDI:

Q. Regarding the medical training. Was she, to your knowledge, was she supposed to be coming to both the Saint Chris appointments and the GI appointments?

A. Yes. She was –

THE COURT: Okay, let's stop this. The testimony on direct because we're not going to – we're not going to get into weeds on this. She did not complete medical training that was offered at Saint Christopher's, Pediatria Specialty and Bethanna. If you have a justification for her missing it, I want an offer of proof now. If not, we're just going to keep on going. What's your offer of proof with this line of questioning?

MR. CAPALDI: I don't have one.

THE COURT: Okay.

MR. CAPALDI: I'll move on.

THE COURT: Move on.

MR. CAPALDI: I'll move on.

Q. Regarding drug and alcohol, you mentioned that she stopped her treatment at STOP in November of last year. Up until that point she had been testing negative, correct?

A. Yes.

Q. Okay. You don't have any information that from that point -- well I believe the Court's only interested until that point because I was (inaudible)

THE COURT: Yes, you can't talk about anything after the fact.

BY MR. CAPALDI:

Q. Right. Right but up to that point she had been testing negative, correct?

MR. WISE: Your Honor, she's only attended 12 out of 48. She wasn't getting adequate screens.

THE COURT: And that's for argument.

So I get it but I'm going to allow Mr. Capaldi to continue.

BY MR. CAPALDI:

Q. Okay. Regarding mental health. She was receiving mental health treatment throughout the history of this case up until November, '15, correct? Not consistently but –

MR. WISE: Objection, asked and answered, Your Honor. And that's not a characterization of testimony.

MR. CAPALDI: Not consistently but –

THE COURT: Okay. I need an offer of proof. Do you have any medical documentation?

MR. CAPALDI: I don't.

THE COURT: Mental health documents?

MR. CAPALDI: I don't.

THE COURT: For your client? Do you have any information about the negative drug screens through STOP, Mr. Capaldi?

MR. CAPALDI: Her testimony but she's -

**THE COURT: Oh, and I'm not allowing her to come back in. So that testimony is out the window because she walked out without permission of the Court. Even if she was sick she should have had the courtesy to let me know that. So her disdain for the Court has been so noted. Keep going.**

BY MR. CAPALDI:

Q. Have you been out to her home?

A. No, we have scheduled several home assessment appointments and mom hasn't made herself available to that end.

Q. And although testimony was she's not employed and she didn't do employment training through ARC you're aware that she -- her current situation is that she's a full-time homemaker for [A.].

A. No, I did not know that.

Q. You didn't know that?

A. No.

Q. All right.

**MR. CAPALDI: Your Honor, I, unfortunately, have nothing more for this witness. I would ask the Court for leave to see if my client is there –**

**THE COURT: I'm not granting leave. We're doing this case now.**

**MR. CAPALDI: Okay, okay. Well then I have –**

**THE COURT: She can't come back in this room.**

**MR. CAPALDI: Okay.**

**THE COURT: So she has waived her opportunity to give testimony in her own hearing because without leave of the Court she decided to just get out.**

**MR. CAPALDI: Okay.**

**THE COURT: So anything else?**

**MR. CAPALDI: I have nothing else but argument.**

**THE COURT: Okay. And really I'm not even going to allow argument because argument is not evidence. Anything else?**

**MR. WISE: I just have argument as well, Your Honor.**

**THE COURT: Okay. Not allowing argument. All right. So I've heard enough. This is the Court's order. With clear and convincing evidence this Court finds that the parental rights as to [Child] –**

**Out, out. Stay out.**

**MR. CAPALDI: Your Honor, can we see if she was sick?**

**THE COURT: No, no. I'm not -- if she didn't have the decency to tell you -- no, you wait until it's over and then you can find out if she's sick. I won't be long.**

Clear and convincing evidence that the rights as to the mother, [Mother] should be involuntarily terminated at this time. The basis for the [c]ourt's decision is the following.

Mother has not complied with any of her objectives that were present at the time this child was adjudicated dependent on March 20, 2013. She has not complied with Clinical Evaluation Unit. Most recently the testimony has been that she attended STOP and made only 12 out of 48 sessions there. Mom has no documentation to prove that she's ever fully complied with mental health. There's no indication that mom has complied with domestic violence training.

In terms of visitation the record, the testimony will reflect that mom has made 22 out of 40 visits since January, 2015. And mom has not completed medical training at Saint Christopher's, Pediatria Specialty or Bethanna. None of those three agencies has she completed medical training.

So even if this child could . . . go to -- mom couldn't possibly do that because she can't meet the day to day needs of this child. The [c]ourt is satisfied that the [R.s] have shown that they love this child, willing to nurture this child. Most recently the G-tube has been removed. This child has a lot of needs still with speech, physical therapy, occupational therapy and specialized instruction. Mom has not shown enough consistency in this child's life with visits or otherwise for this [c]ourt to even consider remotely the reunification that something that's going to happen.

This case has been open for three years now. So therefore, it's clear with this [c]ourt that that's the proper order to be made that the rights be involuntarily terminated and that's based on 2511(a)1, (a)2, (a)5, (a)8 [sic]. And in terms of the bond this child looks to the [R.s] to meet her day to day needs and so 2511(b) has been taken into consideration.

This [c]ourt finds a finding of safety as of 3/16/2016, reasonable efforts as to the agency. This child is to remain as committed. The appointment as to Mr. Capaldi is going to be discharged within 31 days of this hearing.

This [c]ourt's goal is now adoption. This case can proceed to the adoption unit for further processing. This case is to be transferred to the DHS' unit of adoption within 30 days for further processing as well. All profiles need to be started. There's the child profile and the family profile. And so that is the order of this [c]ourt.

N.T., 3/16/16, at 33–44 (emphases added).

In reviewing an appeal from an order terminating parental rights or changing a permanency goal, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. **Id.**; [**In re**] **R.I.S.**, [36 A.3d 567, 572 (2011)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. **Id.**; **see also Samuel–Bassett v. Kia Motors America, Inc.**,___ Pa. ___, 34 A.3d 1, 51 (2011); **Christianson v. Ely**, 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**

- 22 -

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826–827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Further, in ***Krull v. Krull***, 344 A.2d 619, 620 (Pa. Super. 1975), this Court held that a trial court's grant or denial of a request for a continuance will not be disturbed absent an abuse of discretion. Thus, we will apply an abuse-of-discretion standard to this matter.

- 23 -

"Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996) (quoting *Sullivan v. Shaw*, 650 A.2d 882, 884 (Pa. Super. 1994)).

It is well settled that termination of parental rights implicates a parent's Fourteenth Amendment right to due process. *See In the Interest of A.P.*, 692 A.2d 240, 242 (Pa. Super. 1997) (stating that parents have a "fundamental liberty interest . . . in the care, custody, and management of their children") (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). An individual whose parental rights are to be terminated must be given due process of law, as the termination of parental rights is a constitutionally-protected action. *See In re Interest of K.B.*, 763 A.2d 436, 439 (Pa. Super. 2000) (citing *Santosky*, *supra*). DHS bears the burden to prove proper service by its affirmative act. *In re Interest of K.B.*, 763 A.2d at 439 (citing *Leight v. Lefkowitz*, 615 A.2d 751, 753 (Pa. Super. 1992)).

Section 2513(b) of the Adoption Act provides that at least ten days' notice shall be given to the parents, by personal service or registered mail, to their last known address, or by such other means as the court may require. Further, the section provides that the notice shall state certain

language, including the right to representation and how to obtain counsel if the parents cannot afford counsel. Additionally, the statutory language requires a warning that, upon failure to appear, the hearing will go on without the parent, and the parent's rights to the child in question may be terminated by the court without the parent's presence at the hearing. 23 Pa.C.S. § 2513(b).

Rule 5.3 of the Pennsylvania Orphans' Court Rules provides:

Whenever notice of the intention to do any act is required, such notice shall be given at least ten days prior to the doing of the act, unless a different period is specified by a rule adopted by the Supreme Court or by an Act of Assembly.

Pa.O.C.R. 5.3.

In addition, Rule 15.4(d) of the Pennsylvania Orphans' Court Rules, governing involuntary termination of parental rights, provides that notice of the involuntary termination petition must be given to each parent. Furthermore, Rule 15.6 sets forth the manner of service, as follows:

(a) Notice to every person to be notified shall be by personal service, service at his or her residence on an adult or member of the household, or by registered or certified mail to his or her last known address. If such service is unobtainable and the registered mail is returned undelivered, then:

(1) no further notice shall be required in proceedings under Rules 15.2 or 15.3, and

(2) in proceedings under Rules 15.4 and 15.5, further notice by publication or otherwise shall be given if required by general rule or special order of the local Orphans' Court. If, after reasonable investigation, the identity of a person to be notified is unknown, notice to him or her shall not be required.

Pa.O.C.R. 15.6(a).

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (quoting *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006)).

Regarding the disposition of a dependent child, subsections 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Section 6351(f.2) provides that the evidence of the conduct of the parent that places the child at risk shall be presented to the court at any permanency hearing. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection, and physical, mental, and moral welfare of the child.

Similar to the statute governing hearings on termination petitions, section 6337 of the Juvenile Act provides that a party in a juvenile matter is entitled to representation by legal counsel at all stages of any proceeding. Section 6338 of the Juvenile Act, 42 Pa.C.S. § 6338, provides that a party is entitled to the opportunity to introduce evidence and otherwise be heard on

his own behalf and to cross-examine witnesses. Further, regarding permanency hearings, such as a goal-change hearing, Rule 1608(C)(1) of the Pennsylvania Rules of Juvenile Court Procedure provides that any evidence helpful in determining the appropriate course of action, including evidence that was not admissible at the adjudicatory hearing, shall be presented to the court.

Upon review, we agree with Mother's position. When the trial court indicated that Mother was excused from the hearing upon Mother's assertion that she was ill, the court did not, and could not properly have, placed any constraints on Mother's return to the proceedings. Indeed, the statutory language of 23 Pa.C.S. § 2513 requires a warning to the parent that, upon failure to appear, the hearing will proceed without the parent, and the parent's rights to the child in question may be terminated by the court without the parent's presence at the hearing. Likewise, section 6338 of the Juvenile Act provides that the parent is entitled to the opportunity to introduce evidence and otherwise be heard on her own behalf and to cross-examine witnesses, and Rule 1608(C)(1) of the Pennsylvania Rules of Juvenile Court Procedure provides that, at a permanency hearing, any evidence helpful in determining the appropriate course of action, which could include the parent's own testimony, shall be presented to the court.

This Court has stated, "Termination of parental rights is a drastic measure that should not be taken lightly. Not only are [parent's] rights at

stake here, but [the child's] right to a relationship with [his or her parent] is also at stake." ***In re Adoption of K.G.M.***, 845 A.2d 861, 864 (Pa. Super. 2004) (citing ***In re Adoption of Stickley***, 638 A.2d 976, 980 (1994)). Further, in ***K.G.M.***, this Court opined, "We are unwilling to allow the termination of . . . parental rights, however, without strict compliance with the procedures set forth by the Legislature. . . ." ***K.G.M.***, 845 A.2d at 865.

Here, we find that the trial court ran afoul of section 2513(b) of the Adoption Act and sections 6337 and 6338 of the Juvenile Act, as well as Rule 15.4 of the Orphans' Court Rules, and Pa.R.J.C.P 1608(1).  It did so by excusing Mother from the hearing without informing her that she would not be permitted reentry to the court proceeding, and then refusing to allow Mother's counsel to present any evidence, in the form of Mother's testimony, to rebut the evidence that DHS presented against her.  Although the trial court might well have believed that DHS presented overwhelming evidence against Mother, the trial court violated Mother's constitutional guarantee to due process when it precluded her from the opportunity to be heard.

Accordingly, we must vacate the decree and order and remand the matter for further proceedings before the trial court, which shall include Mother's opportunity to have counsel assist her in presenting her case. Additionally, we caution the trial court to heed the warning previously given in ***Commonwealth v. Smith***, 69 A.3d 259 (Pa. Super. 2013), as follows:

> On remand, and in the future, we remind the trial court that Canon 3(A)(1) of the Code of Judicial Conduct requires judges to

"be faithful to the law." Moreover, Canon 3(A)(3) provides that, "Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity...." Our courts are forums for the assertion and vindication of rights. The integrity and independence of our courts mandate that those who seek to assert those rights should not be told to "suck it up." Our trial courts should not indicate, expressly or implicitly, that they are "not interested" in a person's rights, nor should they instruct defendants to "tell the [Superior Court] about your rights." N.T., 9/27/2011, at 2–3. Those who look to our courts to invoke a particular right, even if incorrectly, should be met with patience, and with fidelity to the procedures that our law requires, not with intemperance. This fundamental precept derives not only from the Canons of Judicial Conduct, but also from our society's bedrock precept that the courts are forums of integrity, justice, and equity.

*Id.* at 267–268.

Additionally, Code of Judicial Conduct Rule 2.8 now provides the content previously embodied in former Canon 3(A)(1). Rule 2.8 provides as follows:

(B) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control.

* * *

*Comment:* [1] The duty to hear all proceedings with patience and courtesy is not inconsistent with the duty imposed in Rule 2.5 to dispose promptly of the business of the court. Judges can be efficient and businesslike while being patient and deliberate.

[2] Commending or criticizing jurors for their verdict may imply a judicial expectation in future cases and may impair a juror's ability to be fair and impartial in a subsequent case.

Code of Judicial Conduct Rule 2.8 (adopted January 8, 2014, effective July 1, 2014).

When the trial court receives this matter on remand, we expect that the hearing will be conducted in a manner mindful of Code of Judicial Conduct Rule 2.8. Moreover, should there be an appeal in this matter, we expect the trial court's Rule 1925(a) opinion to be written in a fashion that sets forth the statutory factors for termination and goal change and ties the evidence to the statutory requirements, so that this Court may readily conduct any future appellate review.

Decree and order vacated. Case remanded for further proceedings consistent with this Memorandum. Jurisdiction relinquished.

Judge Panella joins the Memorandum.

Judge Platt concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/2016

- 30 -