J-S64002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.B.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.B., MOTHER | : : : : : : | |
| | : | No. 1452 EDA 2018 |

Appeal from the Order Entered April 17, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000780-2016,
CP-51-DP-0001845-2011, FID: 51-FN-003665-2011

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 14, 2018**

D.B. ("Mother") appeals from the trial court decree entered on April 17, 2018, that granted the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate her parental rights to her daughter, H.B.M.  She also appeals from the contemporaneously entered juvenile court order that changed H.B.M.'s permanency goal from reunification to adoption.[1]  We affirm.

---

[1] Mother filed a single notice of appeal from the termination decree and the goal change order.  However, the correct procedure is to file a separate notice of appeal for each docket.  **See** Pa.R.A.P. 341, Note ("Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").  Recently, the Pennsylvania Supreme Court held that the failure to file separate notices of appeal from an order resolving issues on more than one docket requires the appeal to be quashed.  **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018).  However, this holding applies only to future cases.  **Id**.  As Mother

H.B.M., born in January 2003, has hypotonic cerebral palsy and Sotos Syndrome, a genetic disorder characterized by a distinctive facial appearance, overgrowth in childhood, delayed development, and learning disabilities. She is non-verbal, and, although she is ambulatory, she utilizes a wheelchair. H.B.M. requires dedicated medical care and cannot perform basic functions such as cleaning and feeding herself without assistance. W.F.M. ("Father") is legally blind and requires Mother's assistance.[2] However, Mother has an intellectual disability which impedes her ability to successfully assist Father and still care for her daughter's essential needs.

The family came to the attention of DHS in August 2011, after in-home protective services were implemented to monitor H.B.M.'s care and supervision. Upon DHS's intervention, the agency discovered that Mother had a history of transience, the family interfered with H.B.M.'s services, and Mother neglected to ensure that H.B.M. consistently received physical and occupational therapy for her developmental delays. Mother neglected to provide fifteen-year-old H.B.M. any education, ostensibly because Mother was not aware that the child's disabilities did not exempt her from compulsory education.

_____

filed her notice prior to the filing of the Supreme Court's decision in **Walker**, we do not quash her appeal.

[2] The trial court also terminated Father's parental rights to H.B.M. We address Father's appeal separately.

In September 2011, Mother became homeless and resided with friends temporarily. She informed DHS that she intended to immediately move H.B.M. into the home of the child's paternal grandfather, but Mother subsequently refused to give DHS an updated address or telephone number. Indeed, Mother neglected to provide any information regarding the relatives or friends who she proposed would care for her daughter until she found stable housing.

On September 20, 2011, DHS obtained an order of protective custody ("OPC") for H.B.M. and it placed her in a residential facility. Following a shelter care hearing, the OPC was lifted and H.B.M.'s temporary commitment continued, with parents allowed liberal supervised visitation in accordance with the facilities' policies. On October 13, 2011, the juvenile court adjudicated H.B.M. dependent and continued her placement. The child received physical therapy and on-going medical treatment, and DHS referred Mother for a family-decision-making evaluation and intervention.

Between January 2012 and June 2016 H.B.M. remained in residential care where she received medical treatment and physical therapy. Mother attended family service plan ("FSP") meetings and was advised of her reunification objectives. Mother's compliance varied. Occasionally, she completed services, but she consistently struggled to maintain stable housing or employment.

William Russell, Ph.D., performed parenting capacity evaluations in March 2015. Dr. Russell opined that Mother needed significant support in

order to successfully coordinate the services and educational services that H.B.M.'s condition required, and that her intellectual disability would make it difficult for her to accomplish that task. The report highlighted that during the five years that H.B.M. had been removed from Mother's care, Mother was unable to maintain employment, obtain stable housing, or demonstrate an understanding of H.B.M.'s medical needs. Thus, Dr. Russell concluded that Mother lacked the capacity to provide safety and permanency, and he identified long-term residential placement as the resolution that best suited the child's needs. However, based upon statements that H.B.M. recognized Mother during their interactions, Dr. Russell recommended that the supervised visitations continue.

In August 2016, DHS filed a petition seeking to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). The trial court appointed counsel for Mother, and both a guardian *ad litem* and legal counsel to represent H.B.M.'s best interests and legal interest, respectively. Mother, testified on her own behalf. She conceded that DHS established by clear and convincing evidence the grounds for the termination of parental rights pursuant to § 2511(a), but contested that it was in H.B.M.'s best interests for her rights to be terminated. N.T., 4/17/18, at 19, 46-47.

Dr. Russell testified that Mother did not have the capacity to care for H.B.M., and introduced a video of H.B.M. going about her daily routine to illustrate the significant level of care that she requires. *Id.* at 25. He expressed particular concern regarding Mother's ability to parent H.B.M., as

- 4 -

Mother's responsibility to assist Father with his physical disabilities demanded her constant attention. *Id*. In addition to Dr. Russell, Yolanda Bronson-Williford, the DHS social worker, testified that it was in H.B.M.'s best interests to terminate Mother's rights, and stated that H.B.M. would not be harmed by termination. *Id*. at 48.

Octavia McLean, H.B.M.'s program specialist at Woods Services residential facility, also testified. She discussed how Mother and Father abused the juvenile court's liberal visitation schedule by visiting H.B.M. daily and remaining beyond the facility's visiting hours. She further explained how the protracted visits interrupted H.B.M.'s daily routine and impacted the child's ability to adapt to her residential environment. *Id*. at 79-80. After the trial court reduced the visitations to twelve hours per week, Mother became uncooperative with the Woods Services Staff—she refused to comply with the notification requirements, ignored the posted visiting hours, and continued to disrupt H.B.M.'s daily routine. *Id*. at 83-87. Mother's conduct coincided with an increase in H.B.M.'s maladaptive behaviors, including self-harm. *Id*. at 101.

At the conclusion of the hearing, the trial court terminated Mother's parental rights. Mother timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

She raises the following questions for our review:

A. Whether the trial court erred and abused its discretion when it changed [H.B.M.'s] goal to adoption because the goal of adoption was not in the best interest of the child[?]

B Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical[,] and emotional needs of [H.B.M.] as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)[?]

Mother's brief at 2. (cleaned up). We address the issues *seriatim*.

First, Mother contends that the juvenile court erred in changing H.B.M.'s permanency goal from reunification to adoption. With regard to dependency cases, we stated :

> The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re N.A.*, 116 A.3d 1144, 1148 (Pa.Super. 2015). Thus, we employ an abuse of discretion standard. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

As it relates to the disposition of dependent children, the Juvenile Act provides the criteria for a permanency plan. 42 Pa.C.S. §§ 6351(e)-(g). Upon permanency review, the juvenile court must determine a disposition best suited to the safety and protection, as well as the physical, mental, and moral welfare of the child. *See* 42 Pa.C.S. § 6351(g). In reviewing a goal change petition, the trial court

> considers the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original

- 6 -

placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In Interest of A.N.P.*, 155 A.3d 55, 67 (Pa.Super. 2017) (*quoting **In re A.K.***, 936 A.2d 528, 533 (Pa.Super. 2007)).

We have further noted:

[w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa.Super. 2006) (some citations omitted).

Presently, Mother argues that adoption does not best serve H.B.M.'s needs because the trial court neglected to consider the fact that DHS failed to present evidence to refute the existence of a parent-child bond which would be detrimental to sever. Mother's brief at 3-4. We disagree.

Contrary to Mother's protestations, the juvenile court did, in fact, consider the needs and welfare of H.B.M., as well as other relevant concerns, such as Mother's progress towards alleviating the circumstances necessitating placement, and the feasibility of the current placement goal. Indeed, Mother does not challenge the uncontroverted evidence in the certified record. That evidence includes the testimony of both case workers assigned to the family and Dr. Russel, who opined that it is doubtful that Mother will ever garner the

capacity to fulfill her parenting obligations toward H.B.M., understand her daughter's complex medical needs, or care for her at home. Thus, we find no error of law or abuse of discretion in the juvenile court's decision to change H.B.M.'s permanency goal to adoption based upon Mother's failure to make appropriate progress in alleviating the circumstances necessitating placement, *i.e.*, her inability to care for H.B.M. **A.N.P.**, **supra** at 67. Phrased differently, the certified record sustains the juvenile court's finding that the goal of reunification is no longer feasible insofar as it is unlikely to be achieved. Accordingly, we do not disturb the juvenile court order changing the permanency goal to adoption.

Next, we address Mother's challenge to the decree terminating her parental rights. We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

To affirm the trial court, we need only agree with any one of the subsections of 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (en banc). Here, we will focus our analysis on § 2511(b), as Mother stipulated that DHS established the grounds for termination under § 2511(a)(1), (2), (5), and (8). Stated plainly, we must consider whether H.B.M.'s needs and welfare will be met by the involuntary termination of parental rights.

The relevant statutory section provides as follows:

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). The trial court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id*. Ultimately, the concern is the needs and welfare of a child. *Id*. Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *In re: K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008).

We have noted that

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, *supra* at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa.Super. 2000)). Love between a parent and child is not the sole determining factor, and love alone is not enough. *In re J.L.C.*, 837 A.2d 1247, 1249 (Pa.Super. 2003).

Initially, Mother contends that the trial court "should have had more evidence to determine whether a parental bond did indeed exist between mother and child." Mother's brief at 6. Essentially, she argues that the court did not consider the parental bond or emotional needs of H.B.M. *Id*. at 7-8.

As noted above, social workers may offer their evaluation regarding a bond between parent and child, and that where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *See Z.P.*, *supra* at 1121; *K.Z.S.*, *supra* at 763. Here, no evidence was presented to show that a bond exists beyond Mother's testimony that she loves H.B.M. and that H.B.M. recognizes her during the visitation.

In contrast to Mother's characterization of the certified record, Ms. Bronson-Williford testified that it is impossible to tell if H.B.M. knows Mother is her parent. She further explained that the relationship is not wholly beneficial, in as much as Mother disrupt H.B.M.'s daily routine, including staying past the time allotted and interfering with H.B.M.'s nighttime routine. After visitation with Mother, H.B.M. engages in maladaptive behavior, including self-injury, although it is difficult to say that Mother is the sole reason for the behavior. Both Ms. Bronson-Williford and Ms. McLean testified regarding H.B.M.'s extensive medical needs, the fact that she would need to be in care for the rest of her life, and the fact that, insofar as could be observed, H.B.M. had bonded with her dedicated care workers at Woods, rather than Mother. The trial court found the forgoing testimony credible and persuasive.

In sum, while Mother argues that the court did not consider the bond between her and H.B.M., the certified record reflects that the court did, in fact, consider whether a parent-child bond existed, and found that it did not. As the court observed in explaining its needs and welfare analysis pursuant to § 2511(b),

> Now, all the evidence I've heard say that these two parents do not have the capacity to have a parental relationship; both cognitively and emotionally, they're not capable of forming a parental bond because of their limitations. And more importantly, [H.B.M.] is not capable of appreciating what's known as a parental bond.
>
> There are suggestions that [H.B.M.] recognizes these two people as her parents [but] the clear and convincing evidence says

otherwise. [H.B.M.] does not recognize them as parental authority—parental figures.

[H.B.M.] has severe limitations, as we've seen through the video and through the testimony—that [she] never recognized, nor does [she] recognize [Mother and Father] as [her] parents, and that's because of the cognitive limitations of [H.B.M.].

Trial Court Opinion, 8/13/18, at 31-32. Thereafter, the trial court concluded that the certified record did not support Mother's assertion that a parental relationship existed between her and H.B.M. based solely upon the child's recognition of her presence during visitations, and it reasoned that terminating parental rights would not harm H.B.M. in the absence of a parent-child bond. *Id*. at 32. As explained, *infra*, we discern no abuse of discretion.

On this record, indicating that there was no meaningful bond between Mother and H.B.M., we find no error in the trial court's determination that clear and convincing evidence supports the trial court's termination of Mother's parental rights with respect to 2511(b).

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/14/18

- 12 -