J-S44032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.A.G., MOTHER | : | No. 234 EDA 2018 |

Appeal from the Decree and Order December 20, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001144-2016,
CP-51-DP-0001725-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: F.E.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.A.G., MOTHER | : | No. 236 EDA 2018 |

Appeal from the Decree and Order December 20, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001146-2016,
CP-51-DP-0001727-2014

IN THE INTEREST OF: J.C., A MINOR  :  IN THE SUPERIOR COURT OF
                                    :      PENNSYLVANIA
                                    :
                                    :
                                    :
                                    :
APPEAL OF: B.G., MOTHER             :
                                    :      No. 237 EDA 2018

Appeal from the Decree and Order December 20, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001147-2016,
CP-51-DP-0001728-2014

BEFORE:  LAZARUS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED OCTOBER 18, 2018**

B.G. ("Mother") appeals from the Decrees and Orders entered on December 20, 2017, which granted the Petitions filed by the Philadelphia Department of Human Services ("DHS" or the "Agency"), and involuntarily terminated Mother's parental rights to three of her children:  C.J.C., a male born in February 2003; F.E.C., a female born in May 2009; and J.H.C., a female born in June 2011 (collectively, "the Children").[1]  The trial court additionally changed the Children's permanency goals to adoption, pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2]  After careful review, we affirm.

_____

[1] The Decrees and Orders were entered pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511.

[2] DHS did not seek to involuntarily terminate Mother's parental rights to another son, S.L.C. (born in September of 2006).  The Children and S.L.C.'s father, G.H.C. ("Father"), consented to the termination of Father's parental rights as to Children and S.L.C.  The court confirmed Father's consent and entered Decrees terminating his parental rights to the Children and S.L.C. on December 20, 2017.  Father did not appeal the termination of his parental rights and has not participated in this appeal.

Dating back to 2005, DHS received reports regarding the Children being neglected. N.T., 12/20/17, at 39-40. In 2013, DHS received additional reports regarding the neglect and sexual abuse of the Children. *Id.* at 23. Specifically, the referral alleged S.L.C. had engaged in sexualized behaviors with F.E.C., who was four years old at the time. *Id.* Further, the referral indicated Father watched pornography with the Children. *Id.* at 40. A safety plan was implemented requiring line-of-sight supervision at all times to prevent further abuse. *Id.* Mother did not abide by the safety plan, and S.L.C. perpetrated additional sexual abuse against F.E.C. *Id.* at 41. There were also allegations that C.J.C. had sexually abused F.E.C. *Id.* at 40.

On July 30, 2014, the juvenile court adjudicated the Children dependent. At that time, C.J.C. was living with his maternal grandparents, and S.L.C. had been hospitalized due to his aggressive behavior. *Id.* at 24. Pursuant to the Orders adjudicating the Children dependent, Mother retained physical custody of F.E.C. and J.H.C. However, the Orders required Father to move out of the home, while Mother was to locate an appropriate adult to move into the home and assist her with the care of F.E.C. and J.H.C. Subsequently, on August 1, 2014, F.E.C. and J.H.C. were placed in foster care, as Mother could not locate another adult who could assist her. *Id.* at 43.

On November 23, 2016, DHS filed Petitions to change the Children's permanency goals to adoption. On November 28, 2016, DHS filed Petitions to involuntarily terminate Mother's parental rights to the Children. The court

conducted a hearing on the Petitions on December 20, 2017. DHS presented the testimony of Sharita Lee ("Ms. Lee"), a Turning Points Community Umbrella Agency ("CUA") case manager for the family. DHS also presented the testimony of licensed psychologist Dr. Erica Williams ("Dr. Williams"), who conducted a parenting evaluation with respect to Mother. Further, C.J.C. testified on his own behalf. Mother attended the hearing, represented by counsel, but did not testify.[3] On December 20, 2017, the court entered Decrees involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The court also entered Orders changing the Children's permanency goals to adoption.

---

[3] The Children had the benefit of both a guardian *ad litem* and legal counsel. Our Supreme Court, in **In re Adoption of L.B.M.**, 161 A.3d 172, 183 (Pa. 2017) (plurality) held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in contested involuntary termination proceedings. The Court noted that legal interests are synonymous with the child's preferred outcome, but the child's best interests are determined by the court. **Id**. Here, the court appointed legal counsel for the Children. Counsel conducted limited cross-examination of Ms. Lee and gave no indication that she spoke to the Children. Further, the Children's legal counsel has not filed a brief in this Court or joined the brief of another party. **See**, **e.g.**, **T.M.L.M.**, 184 A.3d at 590 (noting that counsel's duty to represent a child does not stop at the conclusion of the termination of parental rights hearing). Despite these issues, the record reveals the Children's preferred outcomes are consistent with the trial court's termination of Mother's parental rights. C.J.C. testified he understood the concept of adoption and wants to be adopted by M.G., his maternal uncle, with whom he is currently placed. N.T., 12/20/17, at 72-73. Further, F.E.C. and J.H.C. are bonded and happy in their current placement and do not want to leave. **Id.** at 51.

Mother timely filed Notices of appeal and Concise Statements of errors complained of on appeal.[4]

On appeal, Mother raises the following issues for our review:

1. [Whether] Mother substantially complied with the Family Service Goals as agreed between [Mother] and [CUA]?

2. [Whether] [s]evering parental rights would not best serve the emotional needs of [the Children?]

3. [Whether] [t]he goal change would not serve the best interests of [the Children?]

4. [Whether] [r]easonable efforts were not made, within the meaning of Title 42 Pa.C.S.A. Judiciary and Judicial Procedure § 6351(f)(9)[?]

Mother's Brief at 6.[5]

We review these claims mindful of our standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[4] This Court, acting *sua sponte*, consolidated these appeals for review.

[5] While Mother references J.C. in her Statement of Questions Involved, her argument focuses on the Children. Therefore, we construe Mother's reference to J.C. as a typographical error. Additionally, we have re-ordered Mother's issues for ease of disposition.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004)

(*en banc*). Here, we focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights[,] where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the

- 7 -

child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." …

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

Mother appears to assert the trial court improperly terminated her parental rights pursuant to Section 2511(a),[6] as Mother completed "her goals of parenting and domestic violence [counseling by] … attend[ing] therapy and medication management[,] … attend[ing] visits with her [C]hildren[,] … [and] attend[ing] medical appointments and appointments at the [C]hildren's schools." Mother's Brief at 15. Mother asserts she only failed to maintain stable housing. *Id.* Further, Mother argues she did not receive appropriate

---

[6] Mother does not specifically cite Section 2511(a) in this portion of her Argument, although her quotation of the trial court's Opinion corresponds with the trial court's analysis of Section 2511(a). Throughout Mother's brief, she does not cite relevant authority regarding the involuntary termination of parental rights. Accordingly, she risks waiver of her issues. *See In re Estate of Whitley*, 50 A.3d 203, 209-10 (Pa. Super. 2012) (noting that the argument portion of the appellate brief must contain a discussion and citation of pertinent authorities and failure to cite relevant legal authority constitutes waiver of the claim on appeal); *see also* Pa.R.A.P. 2101; Pa.R.A.P. 2119(b)-(c). However, we decline to find waiver in this instance, as the shortcomings do not impede our review.

services to enable her to properly understand what she learned in parenting and domestic violence classes until six months prior to the termination hearing and was excluded from family therapy. *Id.*

The trial court explained its decision to terminate Mother's parental rights pursuant to Section 2511(a) as follows:

Case Manager, [Ms.] Lee, CUA Case Manager with Turning Points, testified credibly that this family became known to DHS back in 2005, when there were reports of neglect and sexual abuse. The IHPS 2013 referral stated that the older sibling, S.L.C., had sexualized behaviors towards F.E.C., who was four years old at that time. In–Home Services were put into place, and ultimately[,] DHS obtained [Orders of Protective Custody] for all four Children. F.E.C.[] and J.H.C. were removed from Mother's care in August 2014. C.J.C. was removed from Mother's care and placed with his Maternal Grandparents. The eldest sibling, S.L.C., was placed at Fairmount due to aggressive behavior.

[Ms. Lee] opined that Mother still lacks the skills to parent the Children[,] given her intellectual disabilities and developmental delays, without the supervision of another adult. Ms. Lee noted that Mother had completed parenting classes[;] however, Mother had not benefited from completing the classes based on her interaction with the Children. Since [Ms. Lee] has been involved with the case, Mother has not made progress towards being able to independently parent [the] Children.

Dr. Williams provided the [c]ourt with clear, convincing, and persuasive [e]xpert testimony, stating she completed a [parenting capacity evaluation] on Mother in October 2015. At that time[,] Mother did not present with a capacity to provide safety and permanency for [the] Children. She recommended therapy to help her understand the victimization that each of the Children had endured, [and] understand the different people who perpetrated that victimization[,] so that she can begin to support the Children. Mother also did not present with cognitive functioning that would allow her to learn to take information in at the same rate as an average intelligent person. So[,] another recommendation for Mother was to understand her deficits and

her overall functioning. Another recommendation for Mother was to obtain and maintain appropriate housing for at least six months. Dr. Williams recently met with Mother and noted that she was still not able to maintain housing without one of the alleged perpetrators living in the home. Further, she could not obtain appropriate housing[,] despite having a financial resource to obtain it. Dr. Williams specifically addressed this issue[,] stating that [] Mother is compliant with various SCP goals and objectives, and that can be viewed as a strength of hers. However, [despite] almost three years of compliance with each of the objectives, Mother still has not been able to grow her skills to provide safety and permanency for her Children.

[The trial court] relied on this evidence[,] that was clear and convincing[,] that although Mother may have appeared to have complied with many of the requirements for her goals, she nonetheless has not complied with certain goals, and has not recognized what [the] Children have been subjected to, and what their needs are. [The trial court was] not persuaded that Mother can or will remedy the conditions which brought the Children into court supervision. Nor [was] the [c]ourt persuaded that Mother will be able to fulfill her parental responsibilities in the future. Based on the evidence presented, [the trial cout] found clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) (1), (2), (5) and (8).

Trial Court Opinion, 3/29/18, at 28-30.

The record supports the trial court's conclusion that termination of Mother's parental rights is appropriate pursuant to subsection 2511(a)(2). The family became involved with DHS as a result of sexual abuse perpetrated by S.L.C. against F.E.C. N.T., 12/20/17, at 23. After a safety plan was implemented requiring line-of-sight supervision, Mother did not abide by the safety plan[,] and F.E.C. suffered additional sexual abuse. *Id.* at 40-41. C.J.C. later disclosed sexual abuse by Father with respect to all four children, including incidents of sexual abuse perpetrated in front of the other children.

- 10 -

*Id.* at 35, 44. C.J.C. reported consistently hearing screams from F.E.C. and S.L.C. as a result of the abuse. *Id.* at 44. While Mother was in the home at the time the abuse occurred, she did nothing to stop it, claiming she was unaware of the abuse. *Id.* at 44-45.

Additionally, the Children have various special needs. C.J.C. is diagnosed with ADHD, depression and behavioral issues. *Id.* at 30. F.E.C. has an intellectual disability and is delayed developmentally and academically. *Id.* J.H.C. has profound developmental delays and speech issues. *Id.*

Mother's objectives were to be consistent with visitation, participate in individual therapy and medication management, attend parenting classes and domestic violence counseling, and to maintain stable housing. Permanency Review Order, 12/1/14; N.T., 12/20/17, at 24-25. The only goal Mother failed to comply with involved maintaining stable housing. N.T., 12/20/17, at 52. Dr. Williams noted that compliance was a strength of Mother's. *Id.* at 68.

With respect to housing, Mother obtained appropriate housing for approximately five months in 2016, after which she moved because she could not keep up with the expenses. *Id.* at 29. Even during those five months, CUA did not recommend reunification because Mother lacked the skills to parent the Children, given their intellectual disabilities and developmental delays, without another adult present. *Id.* at 29-30. Mother indicated she was living with someone, but the person with whom she was living did not

want to be involved with DHS and, therefore, Mother would not give DHS her address. *Id.* at 48.

For a period of time, Mother had unsupervised visits with Children. On one of the visits, Mother took F.E.C. and J.H.C. to her parents' home, where C.J.C. was living. *Id.* at 50. Despite the prior reports of sexual abuse, F.E.C. reported that Mother failed to maintain line-of-sight supervision while visiting C.J.C. *Id.* F.E.C. returned from other visits and indicated they were at the mall all day with Mother and her boyfriend. *Id.* at 45-46. Mother's boyfriend would discipline the Children, despite CUA's recommendations that Mother not allow him to do so. *Id.* at 46. Further, the Children reported that they were hungry, and strangers would give them food because Mother did not have any money. *Id.* Due to Mother's lack of judgment and control for the Children's safety, her visits went back to being supervised. *Id.*

While Mother completed parenting classes, Ms. Lee did not believe that Mother had benefited from them, based on Ms. Lee's observation of Mother's visits. *Id.* at 46-47. Additionally, Ms. Lee did not believe that Mother had made progress towards being able to independently parent the Children. *Id.* at 49. Further, despite Mother participating in a program specifically designed for individuals with disabilities for six months, Ms. Lee still did not see any improvement in Mother's ability to manage the Children's behavior. *Id.* at 54.

Dr. Williams testified regarding Mother's parenting capacity evaluation. *Id.* at 57. Dr. Williams performed the evaluation in 2015, concluding Mother

lacked the capacity to provide safety or permanency to any of the Children. *Id.* at 60. Dr. Williams observed that, while Mother did not directly harm the Children, Mother was present for many of the reported acts, across multiple households, and failed to serve in a protective role for the Children. *Id.* at 65. Mother's housing concerned Dr. Williams, because she could not maintain housing without one of the alleged perpetrators of abuse living in the home. *Id.* at 62. Further, after Mother left Father, she was in another abusive relationship, demonstrating to Dr. Williams that Mother is not in a position to independently maintain her own safety or living standards, and as a result, could not care for herself, let alone the Children. *Id.* at 67. Given Mother's compliance with her goals, the fact that she did not grow her parenting skills demonstrated to Dr. Williams that Mother's skills in this regard are at capacity. *Id.* at 68.

Accordingly, it is clear that Mother is incapable of caring for the Children, and that she cannot or will not remedy her parental incapacity. The Children have not lived with Mother since 2014. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Therefore, we affirm the portion

of the trial court's Decrees terminating Mother's parental rights pursuant to Section 2511(a)(2).

Having determined termination is appropriate pursuant to Section 2511(a)(2), we next review whether the requirements of Section 2511(b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). *Id.* at 1008.

> Our Supreme Court has explained that,
>
> if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and

- 14 -

caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Mother argues that Ms. Lee, the case manager, "did not testify in any detail on the quality of the bond between [the C]hildren and [Mother,]" instead focusing on the bond between J.H.C., F.E.C., and L.T. ("Foster Mother"). Mother's Brief at 16. Mother faults the trial court for not "reflecting on the emotional bond between [the C]hildren and Mother." *Id.*

The trial court determined that termination of Mother's parental rights best served the Children's needs and welfare, explaining that

Ms. Lee, [the] Case Manager from CUA, Turning Points[,] provided credible, persuasive testimony regarding the Children's physical and emotional needs and best interests. She stated she has visited F.E.C., and J.H.C., in the home of pre-adoptive caregiver,

[Foster Mother], who have been in [Foster Mother's] care for almost three years. [Ms. Lee] noted that these two children have made tremendous progress, both with their trauma therapy, academically and socially, since they were placed with [Foster Mother]. The [c]hildren are bonded with [Foster Mother] and turn to her for love and support. [Ms. Lee] has also visited with C.J.C., who is placed with his [m]aternal [u]ncle[, M.G.,] who lives with [m]aternal [g]randparents also. She stated [that] the [c]hild adamantly told her that he want[s] to be adopted.

C.J.C., who was 14 years and 10 months [old] at the time of the hearing, testified before the [c]ourt and stated that he understands what adoption is about and that he wants to be adopted by [M.G.]

Therefore, the [c]ourt found that clear and convincing testimony was provided that the Children would not suffer irreparable harm if Mother's rights were terminated and that termination of Mother's parental rights and adoption would be in their best interest.

Trial Court Opinion, 3/29/18, at 31-32.

The record supports the trial court's conclusion. F.E.C. and J.H.C. are placed together with Foster Mother. They have resided with Foster Mother since approximately 2014, and Foster Mother provides a pre-adoptive home. *Id.* at 32. Both F.E.C. and J.H.C. call Foster Mother "mommy" and are very bonded with Foster Mother. *Id.* at 33-34. F.E.C. has progressed academically and socially in Foster Mother's care. *Id.* at 34. Further, she no longer acts inappropriately with adults, and men in particular. *Id.* She is thriving in the foster home and is bonded with Foster Mother. *Id.* J.H.C. has also progressed substantially in Foster Mother's care. *Id.* at 35. When J.H.C. was placed with Foster Mother, she was three years old. She could not verbalize any words and had issues with her growth. *Id.* She is currently able to function

- 16 -

normally, although she still has intellectual disabilities that require parenting that is consistent. *Id.* Both children turn to Foster Mother for love and support and have a primary parent/child bond with Foster Mother. *Id.* at 33-34. Further, F.E.C. and J.H.C. had no reaction to separating from Mother. *Id.* at 31-32. Ms. Lee opined that neither F.E.C. nor J.H.C. would suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 34.

C.J.C. resides in a home with his maternal uncle, M.G., and his maternal grandparents. *Id.* at 36. C.J.C. is adamant that he wants to be adopted by M.G. *Id.* at 37, 72-73. C.J.C. visits with Mother weekly, but has expressed that often times he does not want to visit with Mother. *Id.* at 37. Ms. Lee opined that C.J.C. would not suffer irreparable harm if Mother's rights were terminated. *Id.* at 38.

While Mother faults the trial court for its analysis of Mother's bond with the Children, she acknowledges "Ms. Lee did not testify in any detail on the quality of the bond between [the C]hildren and [Mother]." Mother's Brief at 16. Given the lack of evidence of a bond between Mother and the Children, the trial court appropriately focused its analysis on other factors. As the record supports the trial court's conclusion that involuntary termination of Mother's parental rights best serves the needs and welfare of the Children, we affirm the trial court's termination of Mother's parental rights pursuant to Section 2511(b).

Next, Mother challenges the trial court's change of goal for the Children

to adoption under Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and

55 Pa. Code § 3130.74.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Regarding the disposition of dependent children, the Juvenile Act, 42

Pa.C.S.A. §§ 6351(e)-(g), provides the criteria for a permanency plan. The

court must determine a disposition best suited to the safety and protection,

as well as the physical, mental, and moral welfare of the child. *See* 42

Pa.C.S.A. § 6351(g). With a goal change petition, the trial court

> considers the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In Interest of A.N.P.*, 155 A.3d 55, 67 (Pa. Super. 2017) (quoting *In re*

*A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007)).

We have further noted that

> [w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care,

protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.[A.] § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

In Mother's third and fourth issues, she argues that the trial court erred in changing the Children's permanency goal to adoption. Mother asserts that the services provided to her were not calculated to meet her individual needs, as Mother's intellectual disabilities required a targeted program. Mother's Brief at 16. Mother also faults DHS for permitting Foster Mother to participate in family therapy, while excluding Mother. *Id.* at 14-15. Mother acknowledges that she participated in a service for individuals with intellectual disabilities, but asserts that her participation for approximately six months prior to the goal change hearing was insufficient. *Id.* at 14. Mother concludes that because DHS "did not meet its obligation to make all reasonable efforts[,] a goal change was not appropriate." *Id.* at 17.

The trial court explained its decision to change the Children's permanency goal to adoption as follows:

Competent and persuasive evidence was presented to this [c]ourt by the [c]ase [m]anager that reasonable efforts were made by the Agency to give Mother the avenue for reunification with her [c]hildren. And clear, convincing and persuasive expert testimony was presented by Dr. Williams that[,] although Mother did use the referrals and resources provided to her by the Agency, she never gained the skills to parent [the] Children, nor the insight to their trauma and their needs and welfare. Mother also did not gain the skills to provide safety and permanency for [the] Children.

- 19 -

Trial Court Opinion, 3/29/18, at 32-33.

The record supports the trial court's decision to change the Children's permanency goal to adoption. Despite Mother's participation in multiple programs to assist her, she did not demonstrate an ability to appropriately parent the Children. Dr. Williams believed her parenting skills are at capacity. Further, even while participating in a "targeted" program, Mother did not demonstrate an increase in her parenting skills. Finally, while Mother claims she was excluded from family therapy, the record reveals that Foster Mother was asked to participate by the therapist because the therapy involved caregivers. N.T., 12/20/17, at 53. Based on Mother's lack of progress and the status of the Children in their foster homes, the record supports the trial court's decision to change the Children's permanency goal to adoption.

For the foregoing reasons, we affirm the trial court's Decrees and Orders.

Decrees and Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/18/18

- 20 -