J-S83013-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  L.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  A.P., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 960 WDA 2018 |

Appeal from the Order Entered May 30, 2018
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000043-2016

BEFORE:  PANELLA, J., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY PANELLA, J.:                 **FILED AUGUST 30, 2019**

A.P. ("Mother") appeals from the goal change order dated May 30, 2018, changing the permanency goal of her minor daughter, L.A.P. ("Child"),[1] to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.  We affirm.

On July 25, 2016, Jefferson County Children, Youth, and Families ("CYF") filed an application for emergency protective custody of Child.  ***See*** Emergency Application, 7/25/16, at 1-5.  The application averred that Child was born in July 2016 and, at the time of her birth, experienced symptoms of opiate withdrawal; accordingly, she was kept in the hospital to treat her symptoms.  ***Id.***  Mother tested positive for tetrahydrocannabinol ("THC") and Subutex, and Mother and her paramour had left the hospital and returned showing signs of mental impairment.  ***Id.***

---

[1] Father voluntarily relinquished his parental rights; he is not a party to this appeal and has not separately appealed.  N.T., 5/30/18, at 3-6.

Additionally, the application averred that Child's vaginal area and buttocks were severely irritated and bleeding, and that this could be the result of severe diaper rash or sexual assault.[2] *Id.* The shelter care application was granted; following a shelter care hearing, Child was admitted to the Children's Hospital of Pittsburgh due to her withdrawal symptoms and other health concerns. *See* Order, 8/1/16, at 1. On August 5, 2016, CYF filed a dependency petition. *See* Dependency Petition, 8/5/16, at 1-7.

Pending Child's adjudication, she was returned to Mother's care on August 10, 2016, after being discharged directly from the hospital. *See* Order, 8/10/16, at 1. Child was adjudicated dependent on September 29, 2016. *See* Order of Adjudication, 9/29/16, at 1-2. At that hearing, Mother's goals were identified as: submit to random drug tests; have Child evaluated by early intervention and follow all recommendations; attend and complete the Nurturing Parent Program; follow through with drug and alcohol treatment; receive a mental health evaluation, and follow all recommendations. *Id.* Following the adjudication, Child remained in Mother's care. *Id.* At a permanency review hearing in December 2016, the court found that Mother was in moderate compliance with the permanency plan. *See* Order, 12/20/16, at 1-2.

---

[2] It appears that, at this time, Mother and her paramour were present at the hospital and actively involved in Child's care. *Id.*

On March 10, 2017, Child was removed from Mother's home following CYF's application for emergency protective custody. *See* Order for Emergency Protective Custody, 3/10/17, at 1. Mother reported to CYF that Child had an injury to her genital area.[3] N.T., 5/30/18, at 17, 28. CYF obtained an order for protective custody of Child, and she was placed with a foster family, where she has remained since.

During the pendency of this case, Mother attended supervised visitation with Child, mental health, and drug and alcohol counseling. N.T., 5/30/18, at 17. Permanency review hearings were held in March 2017, June 2017, September 2017, and December 2017. *See* Order, 5/31/17, at 1-2; Order, 6/28/17, at 1-2; Order, 9/28/17, at 1-2; Order, 12/13/17, at 1-2. In March, Mother's goals were to attend supervised visits, obtain mental health evaluations and follow all recommendations, obtain a drug and alcohol evaluation and follow all recommendations, and participate in a polygraph. *See* Order, 3/29/17, at 1-2. In June, September, and December, Mother's goals were identified as attending supervised visits, obtain a mental health evaluation and follow all recommendations, and complete a psychosexual

_____

[3] Mother's brief asserts that Western PA Cares for Kids, a child advocacy center, determined that sexual assault had occurred following medical and forensic examinations of Child. *See* Mother's Brief at 5-6. A state police investigation ensued, and all parties involved were ordered to participate in polygraphs by the court. *Id.* All parties involved failed the polygraph, but no criminal charges were filed. *Id.* An examination of the record does not reveal any supporting documentation for these averments.

evaluation. *See* Order, 6/28/17, at 1-2; Order, 9/28/17, at 1-2; 12/10/17, at 1-2. In March, June, and September, the court found Mother in moderate compliance with the permanency plan. *See* Order, 5/31/17, at 1-2; Order, 6/28/17, at 1-2; Order, 9/28/17, at 1-2. In December, the court found Mother in moderate compliance, but also noted that Mother was incarcerated.[4] Order, 12/13/17, at 1-2.

In May 2018, CYF filed a petition seeking to change Child's permanency goal to adoption. The court convened a hearing on the petition on May 30, 2018. Child was represented by a guardian *ad litem*.[5] Father, represented by counsel, testified that he was voluntarily relinquishing his rights to Child. N.T.,

---

[4] There is no indication in the record as to why Mother was incarcerated, how long she remained in custody, or whether any criminal charges were filed as a result of her incarceration.

[5] In involuntary termination matters, courts are statutorily required to appoint counsel to represent children's legal interests as well as their best interests. *See In re Adoption of L.B.M.*, 639 Pa. 428, 441-42, 161 A.3d 172, 180 (2017) (plurality). However, a guardian *ad litem* may serve as legal counsel where there is no conflict between child's best and legal interests, and child is pre-verbal, there can be no conflict between those interests. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018). This Court has extended that requirement, generally, to some dependency matters. *See In re J'K.M.*, 191 A.3d 907 (Pa. Super. 2018) (reversing order denying appointment of a separate counsel for dependency proceedings where there was a conflict between the child's best interests and legal interests). Here, Child was approximately one year and ten months old at the time of the permanency review hearing. Accordingly, there could be no conflict between her best and legal interests, and no requirement for the appointment of separate legal counsel. *T.S.*, 192 A.3d at 1092-93.

5/30/18, at 3-6. Shannon Hindman, CYF caseworker, and Allen Ryen, Ph.D., testified for CYF. Mother, represented by counsel, testified on her own behalf.

Ms. Hindman testified that Mother attended a polygraph examination on May 7, 2018.[6] N.T., 5/30/18, at 7-8. The results indicated that she was deceptive when answering questions about the sexual assault and vaginal injury to Child. *Id.* Caseworkers had recommended Mother engage in treatment designed to address Child's victimization and, at the minimum, that Mother's contact with daughter be professionally supervised and that she have no unsupervised contact with anyone under the age of eighteen. *Id.* at 8-9. Additionally, Mother missed one to two appointments per month for mental health and drug and alcohol counseling. *Id.* at 11. Mother also missed visitations with Child claiming she had forgotten, was late to visits claiming she was confused as to the date, and cancelled other visits, despite the fact that all visits were scheduled at the same time on a recurring date. *Id.* at 18-19.

Dr. Allen Ryen performed the bonding assessment for the family.[7] *Id.* at 20. He testified that although the assessment was to be for Mother, Mother's paramour, and Child, Mother's paramour did not attend because he had to work late and he was tired, and Mother then claimed she had to leave

_____

[6] The polygraph examination report was admitted into evidence without objection from Mother's counsel, but does not appear in the certified record.

[7] The bonding assessment and evaluation report were admitted into evidence without objection from Mother's counsel, but are not included in the certified record.

early to take him to work. *Id.* at 21. Dr. Ryen found evidence of a bond between Mother and Child, but that the bond had been disturbed and was conflicted. *Id.* at 22. Dr. Ryen could not "argue strongly against [goal change]" but did note pleasant interactions between Mother and Child. *Id.* at 22. Dr. Ryen did not believe there was a strong enough bond to cause emotional damage to Child if visits were ended, but that he also did not see harm in continuing supervised visitation. *Id.* at 26.

Regardless, Dr. Ryen noted several concerns. First, Mother had serious mental health issues, including a diagnosis of bipolar disorder. *Id.* Mother was not taking medication to treat her illness, and had not been keeping up with follow-up appointments or consistently attending therapy. *Id.* at 22. If Mother was to reintegrate herself into Child's life, she would need to address those issues. *Id.* at 23.

Dr. Ryen's second major "red flag" was that Child had been sexually abused by a person or persons not identified, and it was unclear whether the perpetrator was Mother or her paramour, Father or his paramour, or some combination of perpetrators. *Id.* Dr. Ryen noted that all parties involved had been found deceptive on their polygraph examinations, and that Mother had not made herself seem less culpable by doing so. *Id.* When questioned about the sexual abuse, Mother was "angry" and "sad" but "to [Dr. Ryen's] amazement, tearless." *Id.* at 26.

Mother testified that she was trying to protect her daughter when she reported the sexual abuse to CYF. *Id.* at 27-28. She testified that she has

not had any issues parenting her three older children. *Id.* at 28. Mother averred she had complied with all recommended programming, and that her therapy sessions were now monthly. *Id.* at 29.

At the conclusion of the hearing, the court found that Mother was in moderate compliance with the permanency plan, changed Child's permanency goal to adoption, and denied Mother further visitation with Child. Mother timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issue for our review:

Whether the [t]rial [c]ourt erred in changing the permanency goal to adoption by focusing nearly exclusively on the child being in placement for 15 out of 22 months[?]

*See* Mother's Brief at 5 (suggested answer omitted).

Mother argues that the trial court erred in changing Child's permanency goal to adoption without evaluating the other factors enumerated in the Juvenile Act, 42 Pa.C.S. § 6351(f). *See* Mother's Brief at 7-8. Mother contends that the court focused solely on the fact that Child had been in care for fifteen of twenty-two months, and that the court is not required to change the goal if a child has been in care that long. *Id.* Mother argues that a bonding assessment showed positive interactions between Mother and Child, with mutual affection and appropriate parental attention, and that the goal change was not in Child's best interests. *Id.* at 8.

With regard to dependency cases:

- 7 -

[t]he standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re N.A.*, 116 A.3d 1144, 1148 (Pa. Super. 2015) (citation omitted). Thus, we employ an abuse of discretion standard. *See In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

Regarding the disposition of dependent children, the Juvenile Act, 42 Pa.C.S. §§ 6351(e)-(g), provides the criteria for a permanency plan. The court must determine a disposition best suited to the safety and protection, as well as the physical, mental, and moral welfare of the child. *See* 42 Pa.C.S. § 6351(g). With a goal change petition, the trial court

considers[] the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In Interest of A.N.P.*, 155 A.3d 55, 67 (Pa. Super. 2017) (citation omitted).

We have further noted:

[w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship

- 8 -

of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

Additionally, 42 Pa.C.S. § 6351(f)(9) provides, among several other factors that the court considers at a permanency hearing, that:

> If the child has been in placement for 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made . . .

*See* 42 Pa.C.S. § 6351(f)(9).  The Pennsylvania Supreme Court has reiterated that

> [subsection] (f)(9) is merely one of a number of factors a trial court must consider in ultimately determining whether the current placement is appropriate or if and when another placement would be appropriate based upon the trial court's assessment of what is "best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351 (g).

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).  A trial court is not required to itemize its findings, so long as it considers the various factors of § 6351(f), concludes that reunification is not the appropriate placement goal, and provides reasons for its conclusion that are supported by the record.  *See id.*

Initially, we note that Mother's characterization of the trial court's holding is not entirely accurate.  At the hearing, the trial court observed:

> I am going to find that dependency still exists.  We'll have a review in three months.  The child has been in placement since September of 2016.  The incident that everyone is discussing, the alleged sexual abuse, was in February of '17.

> Since that time, the evidence I've heard, I can only grade mother's compliance as moderate by the number of visits missed when they're set on the same day.
>
> And[,] as such, after this period of time, I am going to change the goal to adoption and end visits, and we'll move forward with a review in five months.

N.T., 5/30/18, at 30-31. The trial court's Rule 1925(a) opinion states, essentially in its entirety, that, "the permanency goal was changed because the child had been in placement for 15 of the last 22 months and the parents were not making any progress towards the goal stated in the Family Service Plan. For the child's permanency, the goal had to be changed." *See* Trial Court Opinion, 7/25/18, at 1.

Here, the evidence introduced at the permanency review hearing and in the record supports these findings. The record showed that Mother was not in compliance with her family service plan. She was not consistently addressing her substance abuse and mental health issues, nor was she regularly attending and participating in scheduled visitations with Child. Additionally, although it had been determined that sexual abuse had indeed occurred, the perpetrator was still unknown, leading to safety concerns for Child if she were to be returned to Mother's custody. Dr. Ryen, who conducted the bonding analysis, observed positive interactions between Mother and Child, but noted that the bond had been fractured and that cessation of visitation would not harm Child. Dr. Ryen did not oppose the idea of a goal change.

The court did not abuse its discretion in determining that a goal change to adoption was best suited to the safety and protection, as well as the physical, mental, and moral welfare of Child. The trial court appropriately considered the necessity for and appropriateness of the placement, the extent of Mother's compliance with the service plan and the progress she had made towards alleviating the circumstances the circumstances that led to the placement. Although the court did not itemize its findings, it considered the statutory factors, concluded that a permanency goal change was appropriate, and its reasons were supported by the record. *See R.J.T.*, 9 A.3d at 1190.

Accordingly, we affirm the goal change order.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/30/2019