J-S11046-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : : : : | |
| APPEAL OF: A.M., NATURAL MOTHER | : : : : : : | |
| | : | No. 1544 WDA 2019 |

Appeal from the Order Entered September 12, 2019
In the Court of Common Pleas of Butler County Criminal Division at
No(s):  CP-10-DP-0000073-2017

BEFORE:  NICHOLS, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: June 8, 2021**

A.M. (Mother) files this appeal from the order changing the permanency goal for L.B., born in December 2012 (Child), to adoption.  This Court previously remanded this matter for Mother's counsel, Nicole L. Thurner (Counsel), to file a new petition to withdraw from representation and ***Anders***/***Santiago***[1] brief or an advocate's brief.[2]  Counsel has filed a new

---

[1] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***see also In re J.D.H.***, 171 A.3d 903, 906 (Pa. Super. 2017) (concluding that ***Anders*** procedures apply in appeals from goal change orders).

[2] Counsel filed a notice of appeal docketed at 1239 WDA 2019 on August 19, 2019, challenging the order granting the petition to terminate her parental rights, and a notice of appeal docketed at 1544 WDA 2019 on October 11, 2019, challenging an order granting a goal change.  Although we previously consolidated these matters for disposition we now address these appeals separately, as they now present different issues.

petition to withdraw and an ***Anders***/***Santiago*** brief. We affirm and grant Counsel leave to withdraw in this appeal.

The trial court summarized the facts and procedural history of this appeal as follows:

The Agency received a referral on June 13, 2017, indicating that Mother and Father were residing together and using drugs. The couple had an extensive history of domestic violence. [The Agency] conducted a home visit at residence of Mother and Father [(collectively, Parents)]. Neither parent appeared under the influence, but appeared to have just woken. However, the Parents were unable to provide a urine screen at that time. Father agreed with and signed the safety plan. On July 6, 2017, Father called the Agency to report that he was at Butler Memorial Hospital detoxing from cocaine use, Mother was homeless and using drugs. Father informed the agency that he had left the Child in the care of [Child's] paternal cousins . . . (the "Kinship [Placement] Family"). [Child] was placed on a 30 day safety plan with the Kinship Placement Family. After that, Father had no contact with the Agency for some time. [The Agency] attempted to contact Mother multiple times. On July 24, 2017, Mother contacted the Agency and acknowledged that she did not have a residence and could not care for [Child]. Mother explained that she was helping a friend remodel, had an interview, and was getting a car fixed. Just before the safety plan was scheduled to end, Father left the hospital. Mother was believed to be homeless. She had not met with [the Agency] or provided a drug test. [Child] was detained on August 7, 2017, when the safety plan ended as both of her parents were homeless and unable to care for her. Upon her detention, [Child] remained with the Kinship [Placement] Family. Neither Mother nor Father attended the Shelter Care Hearing.

An Adjudication Hearing was held on August 23, 2017, at which time [Child] was adjudicated dependent. Mother attended this hearing in person, while Father attended via telephone. Both Parents placed sufficient admissions on the record to support an adjudication of dependency. Mother also submitted to a drug screen on this day, which was positive.

On September 11, 2017, Mother attended the hearing in person, while Father again attended via telephone. Following the hearing,

the Court concluded that it was in the best interest of [Child] to be removed from Mother's and Father's homes. Visitation was ordered, permitting Mother supervised visits twice per week, and Father supervised visits one every other week. The following objectives were also set for Mother:

- Maintain a legal source of income to meet [Child's] needs;

- Choose healthy relationships with people who are drug -free and safe for [Child] to be around;

- Maintain safe and stable[] housing with utili[t]es that are in working order;

- Attend and actively participate in [Child's] medical, dental, educational and developmental appointments to the best of her ability;

- Participate in weekly drug screens with two random drug screens;

- Schedule and attend drug and alcohol assessment and will notify caseworker the date and time;

- Follow any/all recommendations of the drug and alcohol assessment;

- Participate in mental health assessment of a provider of her choice and follow any recommendations made; and

- Inform her mental health providers that information shall be shared with the Agency and will sign any necessary releases.

\* \* \*

On September 12, 2017, Mother was assessed at [Gaiser]. [Gaiser] recommended that Mother received drug treatment. Mother started, but was unable to attend due to the fact that she was residing in Pittsburgh. Mother requested a referral to another agency. Family Pathways also conducted a mental health assessment on the same day and recommended mental health treatment as well. Mother did enter an inpatient treatment program at Cove Forge in October of 2017. Upon her discharge in November of 2017, Mother moved back to her parents' residence in Butler County. Mother then began intensive outpatient treatment at [Gaiser] providing weekly drug screens

while residing with her parents, which were negative. Mother also began receiving Mental Health treatment at the Care Center.

On December 4, 2017, a permanency review hearing was held at which Mother attended . . . . Mother was found to have been in substantial compliance with her permanency plan. She had completed treatment in intensive outpatient treatment at [Gaiser], begun Vivitrol treatments for alcoholism (ultimately, Mother only received 4 treatments before leaving treatment), was living with her parent, and seeking employment. She had generally been providing clean drug screens, though she did have 3 refusals. The [c]ourt found that she had made moderate progress toward alleviating the circumstances which necessitate the original placement.

While living in the highly supportive environment of her parents' home, Mother had been doing very well. Mother secured employment as a Manager at BiLo. She was attending all of the Child's medical and educational appointments. She had also been attending mental health treatment at The Care Center. Mother successfully completed her intensive outpatient treatment with [Gaiser] on February 16, 2017. She was then stepped-down to outpatient treatment. While Mother had been progressing, she experienced a major setback. Mother had a very serious argument with Maternal Grandmother on February 23, 2018, which ended in her being kicked out of the home.

As usual, Mother took no responsibility for her actions and placed the blame on others. Mother alleges that it involved Maternal Grandmother's refusal not to argue in front of the Child. Maternal Grandmother ultimately kicked Mother out. Mother claims that she was unable to get to work and was fired since Maternal Grandmother provided her transportation to work. Mother explained that because Maternal Grandmother did not help her, she relapsed. Mother was discharged from [Gaiser] and the Care Center shortly thereafter for noncompliance. Rather than turn to the Agency for help, or even inform the Agency of her change in residence, Mother states that she went to Catholic Charities for assistance, but was turned downed. Mother failed to maintain contact with the Child or [the Agency] during this period. With the next hearing looming, she entered Cove Forge again on March 25, 2018.

Mother attended the March 26, 2018 Hearing by telephone. Mother failed to acknowledge that had been discharged from her

- 4 -

last IOP [(intensive outpatient program)] with [Gaiser] or the Care Center for non-compliance. Without this information, the Court gave Mother the benefit of the doubt, concluding that she was in moderate compliance with her plan and had made moderate progress. . . .

Mother had been successfully discharged from Cove Forge on May 30, 2018. Following her discharge, Mother entered the Cove Forge Renewal Center, which is a halfway house for women in recovery. Mother again did very well in this highly supportive environment and visited consistently with [Child].

As of the July 10, 2018 permanency review hearing, the [c]ourt again concluded that Mother was in substantial compliance and had made substantial progress. The court noted that Mother was addressing her drug and alcohol addiction, receiving appropriate treatment, and had maintained her sobriety. Mother's lack of stable housing was the only goal that she had not met at that point.

The next Permanency Review Hearing was held on October 9, 2018. At this point, Mother continued to progress. She was still residing in the Renewal half-way house and [maintaining] her sobriety and mental health treatment. However, she was still working on providing stable housing. Consequently, the [c]ourt concluded that she was in substantial compliance with her permanency plan and had made substantial progress. . . .

\* \* \*

Following the December 11, 2018 Permanency Review Hearing, the [c]ourt once more concluded that Mother was in substantial compliance with her permanency plan. While Mother continued to reside in her half-way house, she was complaint with her dual diagnosis treatment, attended visitation and actively sought opportunities to better herself through services. Mother's Counselor at Renewal, Kimberly Benna, testified at the hearing that Mother had successfully completed Renewal's program and would be released in a few days. Ms. Benna further testified that Mother . . . would continue care through a dual counseling intensive outpatient program at Alternative Community Resource Program ("ACRP"). Mother's appointment with ACRP had been already made by Renewal. Mother's progress was also found to be substantial for these reasons. Mother's lack of stable housing was the only goal that she had not met at that point. Though,

Mother was actively involved in Cove Forge's Renewal program, she was working full-time at a call center. . . .

Mother was successfully discharged from her half-way house at the Renewal Center on December 14, 2018. At that point, Mother moved into an apartment that she found and paid for herself. Mother spoke with [the Agency] on numerous occasions, stating that she would be staying in Johnstown area because she had developed a positive support network there. Following her discharge from Renewal, Mother was granted overnight weekend visits with the Child. Transportation of the Child, drug testing and monitoring of the visits was provided by SOS [(Specialty Outreach Services)]. According to SOS, Mother continually tested "negative" and visits with the Child went well.

Clearly, Mother returned to her cycle of struggle following her discharge from the highly structured and supportive environment of the half-way house, though she remained drug-free. Mother asserts that she had significant difficulty finding another program in Johnstown to continue her mental health treatment and drug and alcohol treatment following her release. Mother claims to have called multiple facilities without much success. According to Mother, the facilities all failed to return her calls. Mother specifically stated that she had made numerous phone calls to get into Twin Lakes, but had much difficulty getting a hold of them. She testified that she also relied on friends to call for her. Mother related that a friend finally drove . . . her to Twin Lakes on December 27, 2018, because she could not get a hold of the facility *via* phone. The [c]ourt finds Mother's testimony concerning her alleged difficulty continuing care following discharge from Renewal not credible. Ms. Benna testified at the previous Permanency Review Hearing that Mother's continuing care was arranged and scheduled at ACRP prior to her discharge from Renewal, Mother simply did not follow through, which is consistent with her pattern of behavior when she is not residing in a high structured and supportive environment.

Mother alleges that she completed an intake at Twin Lakes December 27, 2018. Twin Lakes recommended that she attend their recovery group, but it met during her work hours. Again, Mother provided no documentation concerning this intake to the Agency not the [c]ourt. The [Agency] counselor reached out to Renewal to see what is available as he was not familiar with Cambria County. He also called Twin Lakes, looking for

alternatives but did not receive a return call. Renewal was going to compile some options, but [the Agency] never received a list.

Mother claims that she was then laid off from her call center job in January of 2019. However, she never provided any documentation of her employment or subsequent termination of employment. At the time, she was not in any active treatment for drugs and alcohol. Despite claiming that she could not attend Twin Lake's recovery group due to a conflict with her work schedule, Mother chose not to begin any treatment during the three months that she was unemployed.

A Permanency Review Hearing was scheduled for February 15, 2019. However, by consent of all parties, the hearing was continued to May 10, 2019. On March 1, 2019, the Agency filed a Petition for the Involuntary Termination of Parental Rights of [Mother. The trial court appointed Ronald N. Thomas, Esq., Child's dependency guardian *ad litem* (GAL), to represent Child at the termination hearing. The clerk of the court issued a notice to Mother regarding the petition to terminate and the scheduling of a hearing for June 26, 2019. The notice advised Mother that she had a right to counsel if she could not afford one. Neither the record nor the docket contains a petition by Mother seeking appointed counsel for the purpose of the termination hearing.]

Following the filing of the Petition, Mother contacted her [Agency] caseworker on March 21, 2019, claiming to have finally started mental health treatment at ACRP. She claimed to have completed an intake and met with a counselor by the name of Tessa at ACRP, but had not started treatment. However, she failed to provide any treatment records or sign a release. When [the Agency] called ACRP with whom Mother claimed to be treating, the voice mail system did not include any employee by the name of Tessa. Despite leaving messages on two different occasions, [the Agency] was unsuccessful in making contact with anyone at ACRP to confirm Mother's claims of treatment.

Mother also claimed to have begun a part-time posit[i]on with Giant Eagle. While her hours varied, she stated that she did not work weekends while she had overnight visitations with [Child]. Mother was unaware of any specific dates of her employment. Moreover, Mother has never provided documentation of her employment to the Agency.

On April 5, 2019, an incident occurred where Mother contacted SOS, the entity providing transportation of [Child] and case

management in Cambria County, and indicated that she was not available when [Child] was to be dropped off for her weekend visits. Mother asserts that asked SOS to transfer custody to a friend. SOS contacted the Agency stating that Mother wanted [Child] to be given to her "boyfriend." The Agency stated that this was not acceptable as [the Agency] w[as] completely unaware of who[] this person was. Mother's casework then testified that he received a follow up call from SOS stating that the issue had been resolved, with no further information. The SOS represent[ative], and Mother testified that she believed, that [the Agency] had stated that SOS could release [Child] to a female caregiver of Mother's choosing, with no additional clearances or information needed, so long as the Caregiver provided identification to SOS. The court specifically found this testimony lacked credibility. Despite knowing that she needed to provide drug testing, she did not believe this would be necessary of her caregiver despite the fact that the caregiver was also in recovery. Mother does not dispute that she never informed the Agency that she would be working during [Child's] visit, despite speaking with her caseworker regularly.

On May 10, 2019, the final Permanency Review Hearing was held. Mother testified during that hearing that she was working two jobs. She had recently secured a new full-time job at a call center and was still working at Giant Eagle on the weekends. Again, she failed to provide any documentation. Consequently, she claimed to be working during her overnight visitation with [Child]. However, Mother did not inform the Agency that she would be working, nor did she inform the Agency who would be caring for the Child during this time. The caregiver(s) chosen by Mother was not known to nor cleared by the Agency. Furthermore, Mother had failed to provide any documentation of any mental health or drug and alcohol treatment since her discharge from Renewal. Given the safety concerns following Mother's decision to leave the Child with a caregiver unknown to the Agency, Mother's visitations were reduced from overnights to weekly six-hour visits.

On June 10, 2019, Mother was, incarcerated for a violation of house arrest. At no point prior to this day did Mother inform the Agency of the charges pending against her or the fact that she had pled guilty to the charges.[fn1] Mother violated the Mother violated the terms [of her house arrest] by failing to communicate with the Cambria County Probation office on numerous occasions. According to Mother, it was again someone else's fault. This time it was the Cambria County Office of Probation and Parole that

failed to return her phone calls. It is important to note that despite being in contact with the Agency, SOS, and the [c]ourt [in the instant matter], she did not seek assistance in attempting to contact her Parole officer.

> [fn1] Mother's current incarceration arose from a guilty plea in August of 2018, arising out of . . . separate [driving under the influence] charges in late 2017. Pursuant to that plea, Mother was sentenced to 6 months of Intermediate[ ] Punishment, which involved 42 days of house arrest followed by restorative sanctions. According to her plea, Mother had 30 days to arrange for her house arrest through Cambria County. Mother failed to do so. Consequently, on June 14, 2019, she was incarcerated in the Butler County Jail with a sentence of 32 days to 1 year. She is expected to be released on July 15, 2019, with the remainder of her sentence to be served through parole.

Trial Ct. Findings of Fact, Op., & Order, 6/26/19, at 1-12.

The trial court held a hearing on the termination of parental rights and goal change petition on June 26, 2019. At the beginning of the hearing, Counsel requested a continuance noting that the trial court had not formally appointed her as Mother's termination of parental rights counsel and that Mother was currently incarcerated. N.T., 6/26/19, at 12. Following a discussion with the trial court, Counsel represented, that she was prepared and asked to court to appoint her as Mother's counsel for the termination hearing. *Id.* at 13.

The Agency presented the testimony of (1) Mother's probation officer, Gregory Bowers, (2) Agency caseworkers, Tanya Montgomery, Serena Johnston, and Matthew Duncan, (3) Agency casework supervisors, Rochelle Graham and Nicole Burdett, and (4) Maggie Lynn Kerry, who provided child preparation services at Family Pathways, (5) Patricia Duare, a supervisor with

the Bair Foundation, and (6) a psychologist, Bruce Chambers, Ph.D. Mother testified on her own behalf and presented the testimony of Brenda Alter from SOS. Attorney Thomas, Child's GAL, represented Child at the termination hearing.

By order dated June 26, 2019, and docketed September 12, 2019, the court changed Child's permanency goal from reunification to adoption. Mother timely filed the appeal at 1544 WDA 2019 and statement of concise errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Counsel originally filed a petition to withdraw and *Anders*/*Santiago* brief in each appeal. This Court denied the petitions to withdraw finding that Counsel's letters to Mother were confusing as to when Mother could respond *pro se* or with new counsel to Counsel's request to withdraw. *In re L.B.*, 1239 & 1544 WDA 2019, at 6-7 (Pa. Super. filed May 11, 2020) (unpublished mem.). We further noted that Counsel's *Anders*/*Santiago* briefs lacked discussion of possible issues regarding the Agency's exercise of reasonable efforts with respect to the goal change. *Id.* at 11. This Court struck the original *Anders*/*Santiago* briefs and remanded to the trial for Counsel to file advocates' briefs or new petitions to withdraw along with proper *Anders*/*Santiago* briefs. Counsel has filed a new petition to withdraw and a new *Anders*/*Santiago* brief. Mother has not responded.

In her present *Anders*/*Santiago* brief, Counsel notes that upon Mother's request, she filed a notice of appeal and a concise statement of errors complained of on appeal. *Anders*/*Santiago* Brief, 1544 WDA 2019, at 10.

Counsel summarizes her issues from her Rule 1925(b) statement, which we have reordered as follows:

(1) Failure to Timely Appoint Counsel in Violation of Appellant's Due Process Rights;

(2) Failure to Meet Burden of Proof under 23 Pa.C.S.[] § 2511(a);

(3) Cursory and Unsupported Analysis under 23 Pa.C.S.[] § 2511(b).

(4) Failure to Make Findings of Fact as to the Nature and Strength of the Bond and Relationship of the Child with the Parents or Guardians; [and]

(5) Failure of the [GAL] to Fully and Faithfully Investigate;

(6) Failure to Feasibly or Adequately Provide Appellant with Services Necessary to Complete her Tasks and Objectives;

*See id.* Only the last issue arguably pertains to the goal change matter.

When faced with an ***Anders/Santiago*** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. ***See J.D.H.***, 171 A.3d at 905. As this Court has stated:

To withdraw pursuant to ***Anders***, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [***Anders***] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

With respect to the third requirement of ***Anders***, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*Id.* at 907 (citations omitted).  Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*In re Adoption of M.C.F.*, ____ A.3d ____, ____ 2020 PA Super 78, 2020 WL 1501293, *1 (Pa. Super. filed Mar. 30, 2020) (citation omitted).

"After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted).  Our independent review is not limited to the issues discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. *J.D.H.*, 171 A.3d at 908 (citation omitted).  An appeal is frivolous when it lacks any basis in law or fact. *See M.C.F.*, 2020 WL 1501293, at *2; *accord Santiago*, 978 A.2d at 355.

Here, Counsel has complied with the ***Anders***/***Santiago*** procedures by filing a petition to withdraw and supplying Mother with a copy of the ***Anders***/***Santiago*** brief and a letter explaining Mother's appellate rights. Ex. A to Counsel's Mots. to Withdraw, 6/29/20, at 1 (informing Mother "[y]ou have the right to retain new counsel, proceed *pro se* or raise any additional points that you deem worthy of the court's attention. Should you decide to proceed, you must do so quickly"). Moreover, Counsel's brief includes a summary of the relevant factual and procedural history, and Counsel explains her conclusions that the issues preserved in her Rule 1925(b) statement lack merit. Because Counsel has complied with the threshold requirements to withdraw, we proceed to an independent review of whether the issues raised lack merit. ***See S.M.B.***, 856 A.2d at 1237-38.

As noted above, this Court previously flagged an issue as the Agency's reasonable efforts when seeking a goal change. ***In re L.B.***, 1239 & 1544 WDA 2019, at 6-7 (Pa. Super. filed May 11, 2020) (unpublished mem.). Counsel listed an issue that the Agency failed to feasibly or adequately provide Mother with services necessary to complete her tasks and objectives. ***Anders***/***Santiago*** Brief at 10. Counsel states this issue lacked merit because:

> It is clear that [the Agency] provided services to Mother to address her mental health, addiction and housing. [The Agency] provided services through Cove Forge and subsequently Gaiser to help Mother address her addiction. Further, [the Agency] provided Mother the opportunity to address her mental health through the Care Center in Butler County. However, Mother decided to go to Cove Forge in Indiana County. Upon her successful discharge from that facility, she decided to move to an apartment in Johnstown, Pennsylvania, despite her case remaining open in

Butler County. [The Agency] provided transportation for [Child] to Johnstown to visit with Mother. Upon Mother's discharge from Cove Forge, she was to enter into follow up treatment with [ACRP] in Johnstown, Pennsylvania, which [the Agency] approved. However, upon her discharge, Mother did not follow through with the treatment with [ACRP] nor did she request any additional services from [the Agency] to assist her with her treatment.

*Anders*/*Santiago* Brief at 16-17.

Additionally, Counsel discusses the goal change to adoption noting that

Mother has found suitable housing and has maintained her sobriety. However, testimony revealed that Mother was not addressing her mental health. Mother never requested assistance from [the Agency] to obtain her mental health treatment, help in scheduling any mental health appointments or assessments, nor did Mother request any additional services to help address her mental health. The trial court determined that [the Agency] met their burden in the goal change proceeding and ordered that the goal in this case be changed from reunification to adoption.

*Id.* at 15.

With regard to dependency cases:

[t]he standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re N.A.*, 116 A.3d 1144, 1148 (Pa. Super. 2015) (citations omitted). Thus,

we employ an abuse of discretion standard. *In re L.Z.*, 111 A.3d 1164, 1174

(Pa. 2015).

Regarding the disposition of dependent children, the Juvenile Act, 42 Pa.C.S. §§ 6351(e)-(g), provides the criteria for a permanency plan. The court must determine a disposition best suited to the safety and protection of a child, as well as the child's physical, mental, and moral welfare. *See* 42 Pa.C.S. § 6351(g). When faced with a goal change petition, the trial court considers

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In Interest of A.N.P.*, 155 A.3d 55, 67 (Pa. Super. 2017) (quoting *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007)).

We have further noted:

> [w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, the relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child.

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted and some formatting altered).

Additionally, 42 Pa.C.S. § 6351(f)(9) provides, among several other factors that the court considers at a permanency hearing:

> If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made . . .

*See* 42 Pa.C.S. § 6351(f)(9). The Pennsylvania Supreme Court has reiterated that

> [subsection] (f)(9) is merely one of a number of factors a trial court must consider in ultimately determining whether the current placement is appropriate or if and when another placement would be appropriate based upon the trial court's assessment of what is "best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351 (g).

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). A trial court is not required to itemize its findings, so long as it considers the various factors of § 6351(f), concludes that reunification is not the appropriate placement goal, and provides reasons for its conclusion that are supported by the record. *Id.*

Finally, courts must conduct regular permanency hearings to review the permanency plan of the child. 42 Pa.C.S. § 6351(e)(1). At each permanency hearing, the trial court must determine "[w]hether reasonable efforts were made to finalize the permanency plan in effect." 42 Pa.C.S. § 6351(f)(5.1). Our Court has observed

> neither federal nor Pennsylvania law defines "reasonable efforts." Pennsylvania Court's Office of Child and Families in the Courts, *Pennsylvania Dependency Benchbook*, § 19.9.1, at 19–33 (2014). Notwithstanding the lack of a legal definition, we discern the

following from prior cases. Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. *In re J.R.*, 875 A.2d at 1118. "By requiring only 'reasonable efforts' to reunify a family, the statute recognizes that there are practical limitations to such efforts." *Id.* at 1118, n. 5 (citing 4[2] Pa.C.S. §§ 6351(e) & (f)). "It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a *reasonable* effort towards reunification." *Id.* (emphasis in original). This Court has stressed that the agency is not expected to do the impossible and is not a "guarantor of the success of the efforts to help parents assume their parental duties." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citing *In re J.W.*, 396 Pa.Super. 379, 578 A.2d 952, 959 (1990)).

*In Interest of C.K.*, 165 A.3d 935, 941–42 (Pa. Super. 2017) (footnotes

omitted).

The trial court here found

Mother began services in September, 2017. Mother received a drug and alcohol assessment at the Gaiser Center in Butler County. A recommendation for treatment was issued. Mother completed a mental health assessment at Family Pathways in Butler, the result of which recommended treatment. At this time, Mother resided in Pittsburgh in Allegheny County. Mother requested that her drug and alcohol treatment be moved from the Gaiser Center, and ultimately, at her choice, Mother entered an inpatient drug and alcohol treatment program at Cove Forge in October, 2017.

Mother completed her program at Cove Forge, and upon her discharge, Mother returned to Butler County to live with her parents. She, then, entered an intensive outpatient treatment program at the Gaiser Center and began mental health treatment at the Care Center, both of which are in Butler County. Mother completed the intensive outpatient treatment and began Vititrol treatments.

Around the end of February, 2018, Mother relapsed and was discharged from both the Gaiser Center and the Care Center for noncompliance. At this time, Mother failed to maintain contact with [the Agency]. Without prior communication or notice to [the

Agency], Mother left Butler County and enrolled in Cove Forge once again. She successfully completed that program, where Mother was treated for both drug and alcohol and mental health issues. Mother was released from the program at Cove Forge into the Renewal Center. Mother remained at the Renewal Center until December, 2018.

At no time, from September, 2017 until December, 2019, did Mother request [the Agency] provide additional services. In fact, Mother represented to the Court at the numerous hearings that the services provided to her were helpful and producing positive results. [The Agency] communicated with Mother's counselor at the Renewal Center who advised both [the Agency] and the Court that upon her discharge Mother was to enter a program through [ACRP] in Johnstown, PA. However, Mother did not timely enter the program through ACRP. While Mother communicated regularly with [the Agency], she did not request their help to find additional services. Mother was not credible as to the steps she took to enter a new program to prevent relapse. On March 21, 2019, twenty days after [the Agency] filed the instant Petition, Mother informed [the Agency] that she entered a program at ACRP.

Mother was without drug and alcohol and mental health treatment for only three months. During those three months, [the Agency] made reasonable efforts to provide Mother with reasonable services. However, the Butler County [the Agency] is limited when helping a parent find services out of county. The caseworker made phone calls and talked to service providers in Cambria County. Mother did not want to return to Butler County where appropriate services were available.

Additionally, by Mother's own testimony, she could have attended the Twin Lakes program once she was unemployed, but she did not. The reality is that anytime Mother is not in a structured setting, she fails to remain complaint with services and returns to periods of instability characterized by drug and alcohol use, problems with her mental health, unemployment, and homelessness. This was true when she left her mother's home in February of 2018 and when she was discharged from the Renewal Center in December of 2018. The only time Mother was not in appropriate services was when she relapsed in early 2018 and the first three months of 2019. She was in the services of her choice for at least twelve of the fifteen months that [Child] was in care.

Children and Youth Services provided not only reasonable services for Mother, but exceptional support. It is disingenuous that Mother would now assert that [the Agency] failed to provide adequate services and therefore "set Mother up for failure" as averred in this statement of error. Mother's inability to participate in services was a consequence of her own decisions, within her control or not, as she avers in this statement of errors. In reality, and unfortunately, Mother's stability is fragile when she is not living in a structured environment with consistent accountability.

Trial Ct. Op. at 16-18.[3]

In the instant case, we find that the record supports the trial court's conclusion regarding the Agency's reasonable efforts. There was a continuing necessity for Child's placement, specifically, Mother's failure to address her mental health. For the duration of the matter, Mother had succeeded in meeting her goals when in a highly structured environment, but she was unable to maintain stability when outside such environments. The placement was appropriate and feasible, as Child was thriving and happy in her preadoptive resource. There are practical limitations to the reasonable efforts required, and here, the record supports the trial court's conclusions that Mother did not request the Agency's assistance in setting up the appropriate treatment. As this Court has stated, agencies are not expected to do the impossible. *See C.K.*, 165 A.3d at 941–42.

---

[3] We note that the trial court also suggested that Mother failed to object to the reasonable efforts made by the Agency. Although Mother did not expressly object, she presented evidence that she had difficulty contacting various providers in Cambria County. Moreover, there was testimony that the Agency had difficulty contacting providers in Cambria County as well. Therefore, we decline to find this issue waived.

Furthermore, we agree with Counsel's assessment that Child's best interests were served by adoption. *See A.N.P.*, 155 A.3d at 67. Ms. Burdett, one of Mother's casework supervisors, observed Child interacting with her Kinship Placement Family. N.T. at 121. Child seemed comfortable with her foster parents and sought them out for her needs. *Id.* at 122. Child has not visited with Mother since Mother's incarceration in June 2019. *Id.* at 128.

Mr. Duncan, Mother's current caseworker, testified that Child is receiving services solely for child preparation. *Id.* at 139. She is up to date medically and physically. *Id.* Child is doing well in school and involved in gymnastics and other activities with the Kinship Placement Family and their biological children. *Id.* at 140. Child seeks out her foster mother for her needs and for comfort and affection. *Id.* Child is very bonded with her foster siblings. *Id.* at 140-41.

Dr. Chambers testified that, in his observations, Mother's interactions with Child were appropriate and affectionate. *Id.* at 173. Dr. Chambers stated that Mother did have a bond with Child, but, as noted above, her history of mental health and drug and alcohol issues compromised her ability to parent. *Id.* at 177.

Dr. Chambers also conducted a bonding and psychological evaluation of the Kinship Placement Family. *Id.* at 180. Both foster parents were stable and presented no psychological issues or parental deficits. *Id.* at 180-81. Child was very comfortable interacting with them and had done extremely well in their care. *Id.* Dr. Chambers observed an appropriate bond between Child

and foster parents. *Id.* Child's foster parents were responsive to her, and there was reciprocal affection between them. *Id.* at 181. Kinship Placement Family reported that Child had been integrated well into their family. *Id.* Dr. Chambers had no concerns or reservations about Child being adopted by her Kinship Placement Family. *Id.* at 182. He did not believe that Child would suffer irreparable harm from the termination of Mother's parental rights, particularly if Kinship Placement Family were open to continued contact. *Id.* at 197.

Ms. Kerry testified that she participated in providing child preparation services for Child. *Id.* at 91-92. These services are designed to assist children who have been placed in care to talk about their lives and adjust to the changes that have occurred. *Id.* Ms. Kerry assisted in designing a Life Book for Child to provide an age-appropriate narrative as to why Child was placed in care. *Id.* at 92. Ms. Kerry met with Child twice a month. *Id.* at 93. Ms. Kerry testified that Child is confused about her situation, because she was aware that she had been close to returning to Mother's care, but ultimately was not reunified. *Id.* at 94. After Mother's visits were decreased, Child did not appear distressed by this, although she had previously wanted to return to Mother's home. *Id.*

Based on this record, we agree with Counsel's assessment that a challenge to the goal change was frivolous. Therefore, we affirm the order

- 21 -

changing the goal to adoption in the appeal and grant Counsel's petition in this appeal only.[4]

Order affirmed. Counsel's petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2021

---

[4] We note that the Pennsylvania Supreme Court's conclusion that an issue regarding a GAL's representation of a child's legal and best interests rested on an interpretation of Section 2313(a), which applies to termination of parental rights hearing. *See In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018). Unlike termination of parental proceedings, our courts have not recognized a basis to excuse Mother's failure to object to possible conflicts in the GAL's representation of Child's legal and best interests in a dependency proceeding.